**MONTGOMERY WARD & CO., INC., Relator,**

v.

**COUNTY OF HENNEPIN, Respondent.**

No. C5-89-1477.

Supreme Court of Minnesota.

Jan. 19, 1990.

Thomas R. Wilhelmy, Michael A. Trittipo, Fredrikson & Byron, Minneapolis, for relator.

Thomas L. Johnson, Mark V. Chapin, Hennepin County Atty., Minneapolis, for respondent.

YETKA, Justice.

This is an appeal from the Minnesota Tax Court of a valuation placed on relator's department store for real estate tax purposes. The appeal is based on the tax court's refusal to allow relator to discover information in Hennepin County's possession regarding the operation, leasing and sale of other department stores which relator maintains would have a bearing on valuation of its property. We reverse the tax court and remand for a new trial.

This case presents questions regarding the Minnesota Government Data Practices Act, Minn.Stat. ch. 13 (1988), and the scope of discovery under the Minnesota Rules of Civil Procedure. Before the trial in this case, Ward's requested from Hennepin County various information contained in Hennepin County's files regarding the operation, leasing or sale of department stores and other comparable property. The requested information included exhibits and other evidence submitted to the tax court in an earlier tax abatement matter involving a different department store located in Hennepin County. In the earlier case, *Allied Central Stores (Eden Prairie) v. Hennepin County*, Minn. Tax Court File Nos. TC–4720 and TC–5542, 1988 WL 21105 (Feb. 11, 1988) (hereinafter *"Eden Prairie Donaldson's"*), the taxpayer introduced a "tabulation" of imputed base rent per square foot on 13 stores in the Midwest, including three stores in Minnesota, derived from the stores' level of retail sales.[1] Hennepin County refused to produce the tabulation or any other information regarding the retail sales or rents paid by other stores on the grounds that the information was protected by the Minnesota Government Data Practices Act and, therefore, not discoverable.

Before the tax court trial, both parties made motions to compel discovery. A motion hearing was held in the judge's chambers off the record. Thereafter, the tax court ordered a simultaneous exchange of

all information that the parties intended to introduce into evidence, but took under advisement Ward's request for data concerning the retail sales and rent paid by other department stores.

The trial was held on February 7 and 8, 1989. At trial, two basic issues were considered: (1) whether the assessor's estimated value exceeded the actual fair market value and (2) whether the property was unequally assessed. At trial, both parties presented expert testimony regarding the value of the subject property. Hennepin County's expert estimated that the property's value was $4,500,000. Ward's expert estimated that the property's value was $2,900,000.

During Ward's cross-examination of Hennepin County's expert, counsel for Hennepin County objected to inquiries about the evidence introduced in the *Eden Prairie Donaldson's* case; the court sustained the objection. The court apparently concluded that the expert had not relied on the requested data and, therefore, the data was not relevant.

By order dated June 2, 1989, the court found that Ward's failed to sustain its burden of proving that the assessor's estimated market value exceeds the actual fair market value of the property as of January 2, 1987. In the same order, however, the court concluded that the subject property had been unequally assessed according to the prevailing assessment ratio and, therefore, ordered that the assessor's estimated value for the subject property be reduced from $3,695,700 to $3,289,178.

Ward's timely moved for amended findings of fact, conclusions of law and order for judgment or for a new trial on the grounds that the June 2, 1989, order was not justified by the evidence of record and that the court committed abuse of discretion by refusing to order Hennepin County to produce data concerning other department stores that was submitted in the

---

1. The taxpayer was able to calculate a market value of the department store using a percentage-of-sales-income approach. According to this approach, the property's value is a function of the rental income it generates. Because de-

partment stores are typically owner-occupied, actual rent figures are not available. As a result, in valuing department stores, an imputed rent is typically derived from retail sales.

*Eden Prairie Donaldson's* case. Ward's specifically renewed its motion to compel discovery of the data introduced by the taxpayer in *Eden Prairie Donaldson's*. At the hearing on the post-trial motions and in its brief to this court, Hennepin County argued that Ward's waived its right to seek discovery of the requested data by failing to renew formally its discovery motion until after trial.

The subject property is a Montgomery Ward department store attached to a shopping center commonly known as Terrace Mall located in the City of Robbinsdale. Robbinsdale is a first-tier suburb with a population of approximately 15,000 and is located in the northwest quadrant of the Twin Cities' metropolitan area. The subject property is approximately 4 miles northwest of downtown Minneapolis and well inside the 494/694 freeway system that surrounds Minneapolis and St. Paul.

The department store was constructed by Ward's in 1966 as a free-standing store. In 1980, an adjoining shopping center known as Terrace Mall was constructed. The shopping center now consists of the subject property (Ward's department store and automotive center) with 181,111 square feet, approximately 27 mall shops consisting of about 75,000 square feet, a Rainbow Foods grocery store of approximately 46,000 square feet, and the detached Terrace Mall movie theatre of approximately 20,000 square feet.

The Terrace Mall is not owned by Ward's. Ward's and the owners of the mall are parties to a "Reciprocal Construction, Operation and Easement Agreement" dated October 3, 1979, which controls the parties' rights concerning, among other things, maintenance, use of common areas, parking, mall hours, and advertising.

The buildings are of average-to-good construction quality. The department store, however, has some unutilized space. The partial second floor is unsuitable for sales and is essentially unused. In addition, considerable portions of the first floor were

also vacant at the time the assessor's inspection was made in December of 1986 during the Christmas rush season. Testimony at trial indicated that the mall shops were 67 percent vacant on the assessment date (18 out of 27 were empty) and that, at the time of trial, 23 of 27 shops were empty.

The average size of a modern department store is approximately 100,000 square feet. The size of Ward's was based on projections about the community's development that failed to materialize. This was attributed to the location of the I–94/494/694 freeway system and major revisions to east-west highways which diverted traffic away from Highway 52. In addition, there has been a large increase in retail shopping centers in the northwest quadrant of the Twin Cities' metropolitan area which has contributed to a decline in real sales (inflation adjusted) for the store.[2] At trial, Ward's introduced evidence that the subject's sales volume was approximately $73 per square foot and compared this to the "normal or expected" sales volume of $130 per square foot. Hennepin County's valuation expert did not dispute the fact that the subject department store is performing poorly, however, he attributed the poor performance to factors other than the inherent characteristics of the property.

There are three traditional approaches to determining the market value of improved real property: (1) the cost approach, (2) the market approach, and (3) the income approach. These three approaches were used by both parties' experts, as well as the court, in placing a value on the subject property.

The cost approach is based on the assumption that an informed purchaser would pay no more than the cost of reproducing a substitute property with the same utility as the subject. Am. Inst. of Real Estate Appraisers, *The Appraisal of Real Estate*, 345 (1987). Under this approach, appraisers rely on industry publications to

---

**2.** When plans for the new store were made by Ward's in 1965, third-year sales were projected to be $11,000,000. In total sales expressed in 1967 dollars (adjusted for inflation), the store's annual sales peaked in 1970 at $9,049,871; since that time, they have decreased to $3,891,790.

determine the cost of constructing a similar building and then decrease this figure to account for accrued depreciation. *Id.* Although the cost approach is considered to be somewhat imprecise, especially for older buildings, it is generally accepted as a useful method for putting a ceiling on the value of the property. In this case, neither the parties nor the court put much weight on the cost approach.

The market approach to value is based on the premise that an informed buyer will pay no more for a property than the purchase price of another property of similar size and utility. *See id.* at 311. Under this approach, appraisers attempt to ascertain the sales price of comparable property. *Id.* The validity of this approach in the present case is questionable because, as both parties acknowledged, anchor department stores rarely sell; when they do, it is typically in connection with the sale of a chain of stores, and the purchase price usually includes fixtures and inventory. At trial in this case, both parties introduced evidence of what they considered "comparable sales," however, each party vigorously attacked the comparability of the other side's samples, and neither party introduced evidence concerning the sale of an overly large, poorly performing department store attached to a poorly performing shopping mall located away from the .494/694 freeway system.

The income approach to value was the key area of disagreement between the parties' experts. The income approach attempts to estimate market value by determining the present and future net operating income attributable to the property. *Id.* at 156. This estimated net income is divided by a capitalization rate to ascertain the current price a knowledgeable investor/buyer would pay for the property. *Id.* In the case of property used for retail stores, income is typically earned in the form of rent.

In the case of anchor department stores, however, both parties' experts agreed that, in the Twin Cities' metropolitan area, an-

chor department stores are typically owner-occupied. As a result, recently signed leases with actual rent figures are unavailable. Accordingly, both parties agreed that, in order to utilize the income approach, an imputed or constructive rent for the subject property would have to be determined. This is where the crux of the dispute lies.

Ward's relied on the national publication *Dollars and Cents of Shopping Centers,* published by the Urban Land Institute, as authority for the proposition that market rent for anchor department stores should be determined by multiplying gross sales by 2.5 percent. This method had been used in the *Eden Prairie Donaldson's* case and characterized by the court as reliable.[3] Using this percentage-of-sales method, Ward's arrived at an imputed rent of $1.83 per square foot which, under the income approach, translates into a market value of $2,900,000.

Hennepin County argued that the 2.5 percentage-of-sales method resulted in an artificially low imputed rent because it failed to account for the subsidy that anchor department stores enjoy. It was Hennepin County's position that mall owners charge anchor department stores a below-market rent ("contract rent") in order to enhance the attractiveness of the mall location in the eyes of smaller mall tenants. According to this theory, the smaller mall tenants pay a surcharge in addition to the fair market rental value of their mall spaces in order to benefit from the anchor store's drawing power and to compensate the mall owner for the subsidy it gives the anchor store. Hennepin County argued that the proper approach for valuing department stores is to use the "allocated income approach." Under this approach, the subsidized imputed rent of the department store is calculated by using the 2.5 percentage-of-rent figure to determine the contract rent. The contract rent is then adjusted upwards by "allocating" to it some portion of the surcharge paid by smaller mall tenants to arrive at the economic rent of the anchor department store.

3. Hennepin County was the respondent in *Eden Prairie Donaldson's* and was represented by the same lawyer and used the same valuation expert.

Hennepin County's position is that this economic rent is equivalent to market rent. The surcharge paid by smaller mall tenants is derived from the average rent they pay. In its pre-trial brief, Hennepin County suggested that the court consider the average rent paid by smaller Terrace Mall tenants and use it to increase the contract rent for the subject property generated by the 2.5 percent-of-sales approach to arrive at the economic rent.

In his appraisal report, Hennepin County's expert concluded that the proper economic rent for Ward's was $3 per square foot, which translates into a market value of $4,191,000. It is unclear exactly how Hennepin County's expert arrived at the $3 figure. At trial, when the expert testified that the average rent paid by other tenants in the Terrace Mall was $7.43 per square foot, Ward's counsel objected to this testimony on the grounds that the information about the other tenants' rent was not disclosed to Ward's before the January 18, 1989, deadline as required by the court's December 30, 1988, interim order. The court sustained Ward's objection and excluded evidence concerning the rent paid by these other tenants. The court did not, however, consider whether there was sufficient evidence to sustain the $3 per square foot economic rent utilized by Hennepin County's expert in his appraisal report. In its order dated June 2, 1989, the court somewhat arbitrarily discounted the $3 per square foot figure to $2.75, which, under the income approach, translated into a market value of $3,588,370. Accordingly, the court concluded that relator did not prove that the assessor's estimated market value exceeded the actual fair market value of the property.

The issues presented are:

I. Did relator waive its right to seek discovery of the requested data by failing to request a formal ruling on its discovery motion or renew formally its discovery motion until after trial?

II. Did the tax court abuse its discretion by denying relator's motion to compel discovery when the court failed to analyze the requested data under the Minnesota Government Data Practices Act?

III. Was there sufficient evidence in the record to support a finding that relator failed to sustain its burden of proving that the assessor's estimated market value of the subject property exceeded its actual fair market value?

■■■ I. The question of waiver, the facts not being in dispute, may be decided as a matter of law. A waiver is a voluntary and intentional relinquishment or abandonment of a known right. *Blankholm v. Fearing*, 222 Minn. 51, 57, 22 N.W.2d 853, 856 (1946). As a general rule, rules of court may be waived by the party benefited by the rule either expressly or by conduct. *Saylor v. Sass*, 258 Minn. 300, 305, 104 N.W.2d 36, 39 (1960). In the present case, Ward's would benefit from the rules governing discovery practice; therefore, Ward's may waive its right to discover certain information.

Analysis of this issue is made more difficult by the fact that the December 22, 1988, pre-trial discovery conference was held off the record and in the judge's chambers. The parties have different versions of what was supposed to happen following that conference. Hennepin County suggests that the parties were ordered to exchange appraisals and that the parties' discovery motions were stayed unless a party was dissatisfied with the information it received and renewed its motion. By contrast, Ward's contends that each party was ordered to disclose by January 18 the data on which each intended to rely in its expert testimony and that the court took Ward's motion to compel discovery under advisement. The court's December 30, 1988, order compelled the parties to exchange all the information they intended to introduce into evidence by January 18, 1989, and then provided as follows: "The Court does hereby take under advisement respondent's motion to compel discovery * * * subject to further motion by either party *after the foregoing orders have been*

*complied with* or subject to further order of this Court." (Emphasis added.)

■ Although the above-quoted language supports each party's interpretation, the emphasized portion clearly indicates that no further action was contemplated until it became clear that one party had failed to comply with the order. In other words, no further action on the discovery motions would be made until one party sought to introduce into evidence information that had not been disclosed. Under the December 30, 1988, order, each party had a right to assume that it would be given everything that the other side intended to rely on at trial. Accordingly, no further pre-trial motion was necessary.

At trial, during Hennepin County's direct examination of its expert, the expert attempted to testify about information[4] that had not been given to Ward's as required by the December 30 discovery order. Ward's promptly objected. The court sustained Ward's objection and excluded the list of Terrace Mall tenants and leases as exhibits.

■ During cross-examination, the subject of other department stores came up. Hennepin County objected on the grounds of relevancy, and the court sustained the objection. Ward's argued that the expert had testified about other retail properties all across the Twin Cities. The court said: "But he didn't use that in forming his opinion." The following exchange then took place:

Mr. Wilhelmy (Ward's Counsel): Well, let me ask that.

BY MR. WILHELMY:

Q   Did you use the valuation of the Donaldsons in Eden Prairie at all in the valuation of this department store?

A   No.

Q   Did you use any of the department store data introduced in that case in the valuation of this department store?

A   I think I may have used one comparable.

Later in the cross-examination, Hennepin County's expert stated that he had looked at a summary of leases and "back-up data" of the properties identified in his appraisal report with which he compared the subject. Ward's moved to strike a portion of Hennepin County's appraisal report on the grounds that this "back-up" information was also not produced in discovery. The court then questioned the expert in considerable detail on what the expert relied. The court then concluded that the expert did not rely on the data in question. Based on our review of the record, we are left with a definite impression that the trial court made a mistake in finding that Hennepin County did not rely on the requested data. Ward's counsel said: "Well, if I can just confirm that he didn't use any." The court said: "I won't order that. That's where we always have this struggle. I won't order a blanket turning over of all his files." This statement by the court has all the attributes of a ruling on Ward's motion to compel discovery. The fact that the court did not formally characterize its conclusion as an order denying Ward's motion to compel discovery does not necessarily mean that Ward's subsequent conduct in failing to renew its motion or request a formal ruling amounts to an intentional waiver of the discovery issue. *See Minneapolis–St. Paul Metro. Airports Comm'n v. Stawicki,* 269 Minn. 264, 265, 130 N.W.2d 503, 504 (1964) (once informed that counsel intended to use certain evidence, court made adverse ruling sufficient to preserve question for appeal by stating that "my theory of the law [is that such evidence is inadmissible]"). We are convinced that counsel need not burden the court or encumber the record with recurring objections or motions. Thus, we conclude that Ward's did not waive its right to discover the requested data.

II.   The trial court has considerable discretion in granting or denying discovery requests. *Erickson v. MacArthur,* 414 N.W.2d 406, 407 (Minn.1987). A matter

---

4.  Hennepin County's expert testified that the average square foot rental rate for Terrace Mall tenants was $7.43.

vested in the trial court's discretion is reviewed under the "abuse-of-discretion" standard. Under this standard, a matter will not be disturbed on appeal unless the trial court abused its discretion, exercised its discretion in an arbitrary or capricious manner, or based its ruling on an erroneous view of the law. *See, e.g., Reinhardt v. Colton,* 337 N.W.2d 88, 93 (Minn.1983); *Welfare of R.L.K.,* 269 N.W.2d 367, 371 (Minn.1978).

In its memorandum in support of relator's motion to compel discovery, Ward's noted that Hennepin County had taken the position that the Minnesota Government Data Practices Act precludes discovery of the requested data. Ward's argued that this position was without merit. Ward's pointed out that, although some of the requested data was classified as non-public data and was, therefore, not automatically discoverable, the Data Practices Act provides for a special two-part test when discovery disputes like this occur. Minn.Stat. § 13.03, subd. 6 (1988).

■ Under Minn.Stat. § 13.03, subd. 6 (1988), the two-part test is as follows:

The presiding officer shall first decide whether the data are discoverable or releasable pursuant to the rules of evidence and of criminal, civil, or administrative procedure appropriate to the action.

If the data are discoverable the presiding officer shall decide whether the benefit to the party seeking access to the data outweighs any harm to the confidentiality interests of the agency maintaining the data, or of any person who has provided the data or who is the subject of the data, or to the privacy interest of an individual identified in the data.

There is nothing in the statute that suggests that this two-part analysis is optional. In addition, this court has recently indicated that it is a mandatory procedure when constitutional rights are at stake. *See Erickson v. MacArthur,* 414 N.W.2d 406, 408 (Minn.1987) (plaintiff's right to disclosure of police internal affairs files). In a property tax matter such as the present case, relator's constitutional right to due process is at stake. Accordingly, the two-part analysis is mandatory.

■ With respect to the first prong of the analysis, Rule 26.02(a) of the Minnesota Rules of Civil Procedure provides that: "Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action * * *." Hennepin County has not specifically asserted a privilege. Nevertheless, the fact that other taxpayers provide information about their sales and/or rent to the county with the tacit understanding that this information is not going to be disclosed to competitors may support a conclusion that the information is privileged, at least to taxpayers who had a legitimate expectation of confidentiality. The data introduced as evidence in *Eden Prairie Donaldson's,* however, does not deserve this protection. *See* Minn.Stat. § 13.39, subd. 3 ("Any civil investigative data presented as evidence in court or made part of the court record shall be public.").

■ With respect to relevance, this is apparently the basis for the court's decision to deny Ward's motion to compel discovery. The conclusion that the method of appraisal and the value of another Hennepin County department store is not relevant to the market value of the subject property is unfounded. The assessor is obligated to consider similar property when making the assessment. Minn.Stat. § 273.12 (1988). Even Hennepin County's expert testified that he believed that the evidence introduced in *Eden Prairie Donaldson's* was relevant. In so doing, Hennepin County's expert said: "It may be relevant, however, I felt that the findings I didn't feel—there were other factors that should have been probably brought out in that case and should be brought out in this case." Hennepin County's expert also admitted that, in using the income approach, you need to look at comparable rents of other departments stores in other malls. Thus, it appears that Hennepin County desired to attack the validity of the department store rent data introduced in *Eden Prairie Donaldson's* by introducing its "al-

located-income-approach" theory. However, because Ward's was prevented from discovering the requested evidence that was under attack, the court was presented with a one-sided version of the "allocated income approach," and Ward's was denied the opportunity to prove that this theory did not produce a fair market rent figure from which to calculate a fair market value.

Both parties agreed that the accepted definition of economic rent is "the rent that is justified with the property on the basis of character study of comparable properties in the area. In other words, economic rent is market rent." Given that the income approach to valuation depends on an imputed market rent figure, it seems that the imputed rent paid by other Hennepin County department stores is highly relevant to the determination of the appropriate market rent. Hennepin County chose a $3 per square foot figure, but there is no evidence that $3 per square foot is the market rent for department stores like the Ward's property.

With respect to the second prong of the analysis under the Data Practices Act, Ward's argued in its memoranda in support of its pre-trial and post-trial motions that the privacy interests of other taxpayers would be adequately protected by a carefully tailored protective order. At the hearing on the post-trial motions, Ward's counsel proposed that the information concerning the sensitive data regarding the sales and lease arrangements of other department stores be shielded from Ward's management and used only for the tax proceedings. In addition, Ward's counsel said that he would attempt to persuade Ward's to stipulate that its retail sales data could be similarly utilized by other department stores in future proceedings. Ward's counsel stated that, although he did not have authority to agree to such a stipulation without consulting Ward's inside counsel, he believed that Ward's would agree to such a condition. The trial court did not respond to these suggestions and arguments, and there is nothing on the record to suggest that the court gave them any serious consideration.

In a letter to Ward's counsel dated January 5, 1989, Hennepin County's counsel explained the county's interest in protecting the requested data, as well as the interests of other taxpayers, as follows:

> The County Assessor does possess some retail sales information. However, it will not be utilized in the County's appraisal and I cannot release the information. As you know, information concerning retail sales is very sensitive data which the assessor obtains and utilizes for assessment purposes under the assurance that it will be protected under the Data Practices Statutes. For these reasons, the County Assessor is concerned that the release of this information to competitors will cause property owners to refuse to voluntarily release information needed for assessment purposes.

On the other hand, at the hearing on Ward's post-trial motions, Hennepin County's counsel stated that he spoke with the lawyer who represented Donaldson's in the *Eden Prairie Donaldson's* case, and he recognized that taxpayers who litigate their property tax assessments take a risk that sensitive data may become public.

The purpose of the Data Practices Act is "to reconcile the rights of data subjects to protect personal information from indiscriminate disclosure with the right of the public to know what the government is doing. The Act also attempts to balance these competing rights within a context of effective government operation." Gemberling & Weissman, *Data Privacy: Everything You Wanted to Know About the Minnesota Government Data Practices Act—From "A" to "Z"*, 8 Wm. Mitchell L.Rev. 573, 575 (1982). As to whether the tax court's failure to consider these competing interests amounts to an abuse of discretion, *Erickson*, 414 N.W.2d 406 (Minn.1987), is illustrative. In *Erickson*, this court concluded that the trial court abused its discretion and did not properly balance the competing interests at stake by compelling disclosure of private data without conducting an *in camera* inspection even though the court had analyzed the

data under the Data Practices Act. *Id.* at 409. If there can be an abuse of discretion even where the court applies the Data Practices Act's two-part test, it follows that a failure to apply the test at all should be an automatic abuse of discretion. It is interesting to note that the *Erickson* court did not, however, order the information to be protected, but, instead, remanded the matter with the recommendation that if the trial court again elected to order disclosure, a protective order be carefully drafted to protect the privacy interests of the individuals who provided the requested data. *Id.* at 410.

■ We thus conclude that the trial court in the present case abused its discretion in failing to analyze the requested data under the Data Practices Act. Moreover, in assessing property for taxation, it seems to us that the state or its subdivision should be as concerned as a taxpayer that property and taxpayers be fairly and equitably treated. Accordingly, relevant valuation data that the government has in its files must be made available, subject to an appropriate confidentiality order, to a taxpayer who petitions for review of the government's property tax assessment on the taxpayer's property.

■ III. With respect to the final issue, this court will not disturb findings of the tax court on appeal where its decision is supported by sufficient evidence. *Nagaraja v. Commissioner of Revenue*, 352 N.W.2d 373, 376 (Minn.1984). Nevertheless, even though there is evidence to support factual findings, this court may order a reversal if, upon reviewing the entire evidence, it is left with a firm conviction that a mistake has been made. *City of Minnetonka v. Carlson*, 298 N.W.2d 763, 766 (Minn.1980) (citations omitted). We conclude that there was insufficient evidence in the record to support the trial court's finding that Ward's failed to prove that the assessor's estimated market value of the property exceeded its actual fair market value.

As noted by the trial court in its memorandum supporting its order denying the post-trial motions:

The best that can be obtained from this type of proceeding is a Court-determined *estimate* of fair market value * * *.

The market value issue is a quintessential fact question which must be answered by the Court after considering all of the evidence, much of which is conflicting. Rarely is one appraiser's methodology and opinion accepted in its entirety by the Court.

There is no doubt that the court gave careful consideration to the evidence presented.

In this case, however, the $3 per square foot imputed rent figure used by Hennepin County in its allocated income approach was derived from the excluded evidence of what other Terrace Mall tenants paid and a list of the rents paid by other stores that were not large department stores. Although the court discounted this figure to $2.75, there appears to be no evidence that either figure was an appropriate *market* rent for department stores. By contrast, Ward's appraiser's estimated rent value of $1.83 per square foot and the resulting value estimate of $2,900,000, based on the *Dollars and Cents* publication that was found to be reliable in the *Eden Prairie Donaldson's* case, is the only income approach estimate based on probative evidence of the market rent for large department stores. Given the inherent weaknesses of the cost approach and the absence of truly comparable sales (large, poorly performing department stores located away from the freeway system), it seems that the relator's income approach estimate should have been given over-riding weight.

Accordingly, we reverse the tax court and order a new trial wherein the court shall order discovery, admit into evidence and consider the requested data discussed in this opinion.