CARSON PIRIE SCOTT & COMPANY (RIDGEDALE), Relator,

v.

COUNTY OF HENNEPIN, Respondent.

No. C8–97–1146.

Supreme Court of Minnesota.

April 23, 1998.

Eastlund, Solstad & Hutchinson, Ltd., Mark T. Solstad, David s. Wething, Minneapolis, for relator.

Michael O. Freeman, Hennepin county Atty. by Mark K. Maher, Asst. County Atty., for respondent.

## OPINION

GARDEBRING, Justice.

This case comes to us on certiorari to the Minnesota Tax Court. Pursuant to Minn. Stat. § 278.01 et seq. (1996), relator Carson Pirie Scott & Co. ("Carson") challenged the assessed value of the subject property for tax years 1991, 1992, 1993, and 1994. Although Hennepin County had originally set the assessed value of the subject property at lesser amounts, the tax court valued the property at $6,900,000 for 1991 and 1992; $7,100,000 for 1993; and $7,300,000 for 1994. Having filed no motion for amended findings or a new trial, Carson now appeals from the judgment of the tax court, arguing that the evidence does not support the tax court's income valuation approach; and further, that the tax court improperly relied on the market value approach to determine the assessed value of the subject property. We affirm.

On appeal from a judgment where there has been no motion for amended findings or a new trial, the only question preserved for appellate review is whether the

evidence sustains the findings of fact and conclusions of law.[1] *Tyroll v. Private Label Chemicals, Inc.*, 505 N.W.2d 54, 56 (Minn. 1993) (citing *Sauter v. Wasemiller*, 389 N.W.2d 200, 201 (Minn.1986)). This court will not disturb the tax court's valuation of property for tax purposes unless the tax court's decision is clearly erroneous, which means the decision is not reasonably supported by the evidence as a whole. *Harold Chevrolet, Inc. v. County of Hennepin*, 526 N.W.2d 54, 57 (Minn.1995). The tax court's decision should be considered clearly erroneous only when this court is left with a "definite and firm conviction" that a mistake has been made. *Equitable Life Assurance Soc'y v. County of Ramsey*, 530 N.W.2d 544, 552 (Minn.1995) (quoting *Westling v. County of Mille Lacs*, 512 N.W.2d 863, 866 (Minn. 1994)).

■ This court recognizes three traditional approaches to determining market value for property tax assessment purposes: the market data or sales comparison approach, the cost approach, and the income approach. *American Express Financial Advisors, Inc. v. County of Carver*, 573 N.W.2d 651, 657 (Minn.1998). Under the market value approach, an appraiser compares the subject property with sales of other comparable properties, adjusting for differences such as location, size and time of sale. *Harold Chevrolet*, 526 N.W.2d at 56. The cost approach calls upon the appraiser to determine the current cost of constructing the existing improvements on the property, to subtract depreciation in order to establish the current value of the improvements, and then to add the value of the land. *Id.* The theory underlying the cost approach is that an informed buyer would pay no more for the property than the replacement cost of property with the same utility. *American Express*, 573 N.W.2d at 657. Finally, under the income approach, the appraiser is to determine the rental income the property should generate, subtract expenses, and then capitalize the net income at a rate an investor would expect to obtain from the property. *Harold Chevrolet*, 526 N.W.2d at 56.

We have said previously that, whenever possible, appraisers should use at least two valuation approaches, because the alternative value indications can serve as useful checks upon each other. *Equitable Life*, 530 N.W.2d at 553. However, a final determination of value may require that one or another approach be given greater emphasis in making a final value estimate. *Id.*

■ The property at issue is located in the Ridgedale shopping center in Minnetonka, and consists of approximately 128,395 square feet of retail space.[2] During the entire time at issue, the subject property was owner-occupied and operated as a retail department store. The Hennepin County assessor originally valued the property at $5,758,000 on January 2, 1991, and $5,910,000 on January 2, 1992, 1993, and 1994.

At the tax court hearing on the consolidated petitions, each party presented the testimony of expert witnesses who had prepared valuations of the subject property. Louis W. Frillman, MAI, CRE, testified as an appraisal expert for Carson and James R. Atchison, CAE, SAMA, provided expert appraisal testimony for Hennepin County. James McComb, an experienced real estate consultant, also testified for Carson concerning retail store occupancy costs and the Twin Cites market in retail department sales.

In addition, evidence concerning the sale of the subject property in 1995 became a key point of consideration. In that transaction, Carson sold the store to Dayton–Hudson Corporation ("Dayton–Hudson") as part of a package sale of all eight of Carson's metro-

1. Carson raises an additional issue in its brief concerning whether the county attorney wrongfully withheld certain material information from the county's expert appraiser prior to trial. This issue has not been properly preserved for this court's review. *See Sauter*, 389 N.W.2d at 202. In any case, we find the issue to be without merit, since Carson had prior access to the information in question and was allowed to thorough-

ly cross-examine the county's appraiser about the material.

2. The record is in dispute as to the total size of the building. Carson's appraisal expert testified that the building was 125,758 square feet, whereas Hennepin County's expert testified that the building was 128,395 square feet. The tax court found that the building was 128,395 square feet.

area department stores for approximately $74,000,000. During negotiations between the buyer and seller, Dayton–Hudson concluded that it would go through with a purchase of at least six of the eight properties provided that at least two of the following Carson stores were included in the package: the store at Rosedale Shopping Center, Southdale Shopping Center, and Ridgedale. Because it would be necessary to reduce the total purchase price if one or more properties dropped out of the package, Dayton–Hudson and Carson negotiated a land and building allocation for each property. Douglas Scovanner, a Dayton–Hudson executive, testified that Dayton–Hudson allocated more value on a square foot basis to the properties considered more likely to drop out of the deal—Rosedale, Southdale and Ridgedale. The parties agreed to an allocation of $10,109,000 of the total purchase price to the subject property.

Scovanner testified that the purchase price included benefits other than real estate, because it was a "package deal." However, he also testified, and a letter from Dayton–Hudson to the Federal Trade Commission written before the acquisition affirmed, that the only asset Dayton–Hudson received in the transaction was real estate.[3] Dayton–Hudson did not pay a premium for Carson's trade name, customer list, retailing know-how, work force, inventory control, covenants not to compete, or other intangibles. According to Scovanner, the chief benefits to Dayton–Hudson in acquiring the eight stores as a package were rapid entry for its Mervyn's California stores into the Twin Cities market, the value of locating in a mall rather than

near a mall, and the intangible value of preventing a Dayton–Hudson competitor from acquiring the properties, thus preserving market share for Dayton–Hudson.[4]

Evidence was also adduced showing that a consortium of metro area mall owners and managers had earlier made inquiry into purchasing a package of seven of the eight Carson stores,[5] including the Ridgedale property, for approximately $46,500,000. That amount included $5,820,000 attributed to the Ridgedale property. This offer was not accepted by Carson, which deemed the net price offered by the consortium to be too low.

Frillman, testifying on behalf of Carson, valued the subject property at $4,400,000 for 1991, with incremental yearly increases, reaching a value of $4,900,000 for 1994. He offered testimony about the 1991 market value based on his study of eight comparable sales throughout the United States.[6] None of the comparable sales was in the Twin Cities, which, according to Frillman's testimony, made adjusting the value to the Twin Cities local market quite difficult. He also expressed his belief that in any sale of an existing department store integrated into a super-regional mall, the sale price includes a substantial amount for "blue sky" or intangible assets, and thus, the sale to Dayton–Hudson was not a reliable guide for valuation. For these reasons, Frillman placed no weight on the market value approach in determining the value of the subject property.

As to the cost approach, Frillman offered testimony for 1992 only, and did not utilize the replacement cost method for 1991, 1993 and 1994. He testified that for 1992 the property was being used in its highest and

---

3. Carson likewise indicated that Dayton–Hudson had acquired only real estate in the transaction on Form 8–K, filed with the Securities and Exchange Commission on March 6, 1995.

4. Mervyn's is a department store chain wholly-owned by Dayton–Hudson Corporation. Dayton–Hudson purchased the Carson stores in order to provide locations for the introduction of the Mervyn's California department stores to the Twin Cities market, as part of its overall plan of reinvigorating the Mervyn's chain. Dayton–Hudson had already been exploring various near-mall locations in hopes of opening several Mervyn's California stores simultaneously in the Twin Cities. In addition, by acquiring the sites

for Mervyn's, Dayton–Hudson ensured that its Dayton anchor stores would not have to compete directly against a high-end retailer such as Bloomingdale's or Nordstrom's. Also, the Ridgedale store was projected to become a Dayton store expansion rather than a Mervyn's California.

5. The consortium expressed no interest in the Carson store at Northtown Mall, which was later purchased by Dayton–Hudson as part of the package deal.

6. Frillman did not perform a market approach analysis for tax years 1992, 1993 or 1994.

best use (as a department store), and that no functional or economic obsolescence was attributable to the subject property. He calculated replacement cost at approximately $65 per square foot, or $8,200,000 before depreciation, and a land value of $3,950,000. From this figure Frillman subtracted $4,100,000 (50%) for depreciation on the building and "external obsolescence" of $3,375,000. By this means, Frillman arrived at a cost approach value of approximately $4,700,000 for 1992.

Atchison, testifying for Hennepin County, estimated the value of the property at $9,720,000 for 1991, $9,610,000 for 1992, $9,840,000 for 1993, and $10,080,000 for 1994. Unlike Frillman, Atchison placed greatest emphasis on the market value and cost approaches to appraising the subject property. His market data approach was based primarily upon the sale of the subject property to Dayton–Hudson in 1995, at a price of $10,-109,000, a figure that represents $80.54 per square foot.

Atchison also placed significant weight on the cost approach and performed a cost approach analysis for all four years in question. Based on the economic desirability of the location in "an extremely successful high fashion center," Atchison testified that the property had no economic obsolescence, and agreed with Frillman that a retail department store was the "highest and best use" of the property. For 1991, he calculated the land value at $10 per square foot, or roughly $4,865,000, and replacement cost of the improvements at $65.98 per square foot. From this, he deducted physical depreciation to arrive at a 1991 valuation of $10,210,000. He adjusted this figure annually, arriving at a cost value of $10,470,000 for 1994. When asked on cross-examination whether the $4 million spent by Dayton upgrading the property after purchase should have been deducted as depreciation, Atchison testified that part of the expenditure represented improvements that added value to the property, rather than a reduced value associated with further depreciation.

The main dispute between the two appraisers was in their conclusions under the income approach, although both experts employed the same technique, utilizing a percentage of retail sales per square foot. Both experts relied on actual sales by other Ridgedale anchor stores, sales information from other national chains and published data to determine the sales per square foot and rent percentage variables. Both agreed that the Carson store at Ridgedale was underperforming, with actual sales during the time in question ranging from $108 to $110 per square foot. Therefore, both appraisers attributed sales per square foot well in excess of actual sales: Frillman attributed 1991 sales of $150 to $200 per square foot, and Atchison attributed 1991 sales of $225.

The parties also differed about what percentage of retail sales should be used to calculate market rent for the store. Frillman based his calculations on published figures reported by national chain department stores in *Dollars and Cents of Shopping Centers*, published by the Urban Land Institute. He adopted a 2% market rent figure, a 2% vacancy allowance, and 1% management expense. Utilizing the *Korpacz Real Estate Investor Survey*, he used capitalization rates of 9.5% for 1991 and 9.75% for 1992, 1993 and 1994. Although Frillman characterized Ridgedale as a "dominant well-located" mall, he selected capitalization rates from the higher end of the Korpacz "investment quality mall" category. Using these data, he arrived at income-approach valuations of $4,400,000 for 1991, $4,500,000 for 1992, $4,700,000 for 1993, and $4,900,000 for 1994.

Atchison concluded that a 3% figure was an appropriate rent figure, based on his studies of comparable national chains. He also allowed a 2% vacancy allowance, a 1% management expense, and added a $0.20 allowance for structural maintenance and replacement. Atchison also relied heavily on *Korpacz Real Estate Investor Survey* in determining the capitalization rates, and adopted an 8.0% rate for 1991 and an 8.5% rate for 1992, 1993, and 1994. Based on these figures, Atchison attributed an income valuation of $9,230,000 for 1991, $8,970,000 for 1992, $9,250,000 for 1993, and $9,530,000 for 1994.

■ After the hearing, the tax court set the market value of the property at $6,900,-

000 on January 2, 1991 and January 2, 1992; $7,100,000 on January 2, 1993; and $7,300,-000 on January 2, 1994. In reaching those figures, the tax court placed no reliance on the cost method, following its decision in *Carson Pirie Scott & Co. (Burnsville) v. County of Dakota*, Nos. C7–90–7005, C4–92–7192, C6–93–7673, 1994 WL 329601 (Minn. T.C. July 5, 1994). In that case, the court simply explained that "[n]either [expert] placed much weight upon the cost approach. Because of the age of the building and the difficulty in measuring obsolescence, we agree." *Id.* at *2. Here, also, the tax court apparently concluded that the difficulty in measuring obsolescence made the cost approach less reliable than the other methods of determining value.

This court has recognized that the cost approach is imprecise, owing to the difficulty of calculating the functional and economic obsolescence of older buildings, and is therefore useful in such cases mainly in setting a ceiling on the value of the property being appraised. *Montgomery Ward & Co., Inc. v. County of Hennepin*, 450 N.W.2d 299, 303 (Minn.1990); *American Express*, 573 N.W.2d at 657. Carson, which itself relies heavily on the income method, does not challenge the tax court's decision not to place much weight on the cost approach. Additionally, we see no reason to reverse the conclusion of the tax court on this issue, which accords with our own treatment of the cost approach in similar circumstances. *See Montgomery Ward*, 450 N.W.2d at 303.

■ The tax court also explained that it gave little weight to the market value approach. The court disregarded Frillman's eight comparable sales because none of them were located in Minnesota and many of the properties were distressed at the time of sale, and therefore, not genuinely comparable to the Ridgedale property. The court also found specifically that "location and the ability to gain immediate entry into the Twin City market, two of the Carson's property characteristics attractive to Dayton Hudson, *are characteristics of real estate*" (emphasis

added). On the other hand, the court did conclude that Dayton–Hudson was willing to pay a "premium" for the acquisition of all eight Carson stores, but found that the premium was difficult to measure. Because it was unable to quantify or allocate the premium, the tax court placed little weight on the market value approach, using it only to establish a range of possible values for the property. Those values ranged from $5,820,-000 [7] at the low end to a maximum value of $9,227,000 [8] for 1991 and 1992, and ranged from $6,000,000 to $9,806,000 for 1993 and 1994.

Because of the "package" nature of the Dayton–Hudson purchase, Carson argues here that any reliance at all by the tax court on the market value approach was misplaced and unreliable. In particular, Carson argues that the tax court did not sufficiently take into account the unusual motivations of Carson as seller and Dayton–Hudson as buyer in the 1995 transaction. However, the tax court clearly stated that it placed little reliance upon the market value approach, using it only to establish upper and lower limits within which the assessed value should probably fall. Carson's own expert, in his appraisal of the property, acknowledged that "the direct sales comparison approach to value * * * is not as reliable as it would be if better quality comparable sales were present. However, this approach is an accurate check on the parameters of value for the subject property." Under these circumstances, we cannot conclude that the court's decision to place more reliance on the income approach than on the market and cost approaches is clearly erroneous.

After explaining its reasons for placing little reliance on the market data and cost approaches, the tax court looked principally to the income approach, the method upon which Frillman, Carson's appraiser, also placed most emphasis. The court adopted an attributed sales figure of $200 per square foot, an amount which fell within Frillman's estimate of $150 to $200, and below Atchi-

7. The amount offered by the consortium, which Carson rejected as being too low.

8. The amount of the Dayton–Hudson purchase price allocated to the subject property, time-adjusted backward from 1995 to 1991.

son's $225 estimate. After studying the supporting data provided by both appraisers, and relying on the testimony of McComb, that an anchor store generally pays 2% to 2.5% of sales in market rent, the court adopted a market rent percentage of 2.5%, a figure that fell midway between the 2% and 3% figures offered by the experts. Allowing a 2% vacancy deduction and 1% management fee, as posited by both experts, and granting a $0.20 per square foot reserve, the court arrived at attributed net operating income figures of $597,166 for 1991, $615,829 for 1992, $634,502 for 1993 and $653,200 for 1994.

The court adopted a capitalization rate of 8.75% for 1991 and 9% for 1992, 1993 and 1994. These rates are slightly higher than the national rates for investment quality malls, based in part on the opinion expressed by both experts at trial that the Korpacz survey information covers mall property with lower risk than anchor store properties. The court's capitalization rates were well below the rates used by Carson's expert, Frillman. Based on the figures adopted by the court, the value of the subject property was ordered increased on the Hennepin County tax rolls to $6,900,000 for 1991 and 1992; $7,100,000 for 1993; and $7,300,000 for 1994.

This court has frequently reiterated that real estate appraisal is an inexact value determination, with the respective weight to be placed upon each of the three traditional approaches to value depending on the nature of the property and the reliability of the data in the particular case. *Harold Chevrolet*, 526 N.W.2d at 59. In *Montgomery Ward*, we observed that

> a tax court proceeding is not high-low arbitration where the decisionmaker must choose the figure submitted by one or the other party. The Tax Court brings its own expertise and judgment to the hearing, and its valuation need not be the same as that of any particular expert as long as it is within permissible limits and has meaningful and adequate evidentiary support.

482 N.W.2d at 791 (citation omitted).

In the present case, the tax court heard and considered the testimony of the two expert appraisers, and reviewed post-trial briefs. The court discussed all three of the traditional approaches to determining market value and the reasons for which it made the decisions it did. The values reached by the court represented a reasoned approach, using the range of values provided by the experts, the court's own judgment and expertise in property valuation, and taking into consideration the other testimony on the record. Under these circumstances, the decision of the court was not clearly erroneous.

Affirmed.

GILBERT, J., took no part.