STATE OF MINNESOTA

IN SUPREME COURT

A15-1605

<table>
<tr><td>Tax Court</td><td>Anderson, J.</td></tr>
<tr><td></td><td>Took no part, Chutich, J.</td></tr>
</table>

Archway Marketing Services,

Respondent,

vs.                                                                       Filed: July 27, 2016
                                                              Office of Appellate Courts

County of Hennepin,

Relator.

_____

Douglass E. Turner, Hanbery & Turner, P.A., Minneapolis, Minnesota, for respondent.

Michael O. Freeman, Hennepin County Attorney, Jane N.B. Holzer, Thomas F. Pursell, John J. March, Assistant Hennepin County Attorneys, Minneapolis, Minnesota, for relator.

_____

S Y L L A B U S

1.      The tax court's decision to reject the sales comparison approach and instead rely exclusively on the income capitalization approach was contrary to the evidence and not supported by adequate reasoning.

2.      The tax court's rejection of lease comparables used in the County's income capitalization analysis was not clearly erroneous, because it was undisputed that the lease comparables did not reflect market rates.

1

3.     The tax court's rejection of the comparables used to calculate a capitalization rate was not clearly erroneous, because the appraiser's report and testimony do not support the County's argument that the appraiser's underlying financial assumptions were irrelevant to the calculation of the capitalization rate.

Reversed in part, vacated, and remanded.

Considered and decided by the court without oral argument.

O P I N I O N

ANDERSON, Justice.

Respondent Archway Marketing Services (Archway) challenged relator Hennepin County's assessment of the market value of two bulk-distribution warehouses for the assessment dates of January 2, 2009, and January 2, 2010.  Following a trial, the tax court adopted market valuations lower than the recent sale price of each subject property.  The County appealed, asserting that the tax court erred by rejecting the County's sales comparison analysis and a large portion of the County's income capitalization analysis. Although the tax court did not err in rejecting portions of the County's income capitalization analysis, the tax court failed to adequately explain its reasons for rejecting the County's sales comparison analysis.  We therefore reverse the portion of the tax court's decision that rejects the County's sales comparison analysis, vacate the tax court's order, and remand to the tax court for further proceedings consistent with this opinion.

I.

This appeal concerns the tax value of two neighboring warehouse properties as of January 2, 2009, and January 2, 2010.  Archway Phase I (Archway I) and Archway

2

Phase II (Archway II) are adjacent bulk-distribution warehouses in Rogers. Both were constructed pursuant to build-to-suit leases held by AHL Services, Inc. (AHL), but are occupied by AHL's subsidiary, Archway. In 2010, the owner of the property sold the fee-simple interest in Archway I for $19,700,000. The fee-simple interest in Archway II sold for $18,870,051 in 2012.

For tax purposes, the Hennepin County Assessor valued Archway I at $18,663,000 as of January 2, 2009, and $18,326,000 as of January 2, 2010. The assessor valued Archway II at $13,774,000 as of January 2, 2009, and $12,000,000 as of January 2, 2010. Archway challenged these valuations, and the matter proceeded to trial before the tax court. Archway retained Paul G. Bakken to prepare an appraisal, and Justin J. Massmann prepared an appraisal on behalf of the County.

We have recognized three methods of real estate appraisal: (1) the sales comparison approach, (2) the income capitalization approach, (3) and the cost approach. *Equitable Life Assurance Soc'y of the U.S. v. Cty. of Ramsey*, 530 N.W.2d 544, 552 (Minn. 1995). Both appraisers employed the sales comparison approach and the income capitalization approach. The parties later stipulated that the cost approach was not an appropriate method for valuing the subject properties.

The tax court found that Archway had overcome the prima facie validity of the Hennepin County Assessor's valuation, and thus the tax court considered the input provided by the parties' expert appraisers. *See Westling v. Cty. of Mille Lacs*, 512 N.W.2d 863, 866 (Minn. 1994) (stating that a county assessor's valuation of real property

3

is prima facie valid).[1]  But the tax court found numerous problems with the appraisals presented by the parties.  First, the tax court rejected each appraiser's sales comparison analysis due to issues with the underlying data.  The tax court then rejected much of the data that the appraisers relied on for their income capitalization analyses.

With sparse data left to examine, the tax court completed its own income capitalization analysis using data from surveys that were cited by the appraisers.  The court valued Archway I at $14,462,000 as of January 2, 2009, and $11,531,000 as of January 2, 2010.  The court valued Archway II at $12,286,000 as of January 2, 2009, and $9,811,000 as of January 2, 2010.  The assessed values, appraised values, and actual sale prices of each subject property are summarized below.

| Appraisal Year | Actual Sale Price | County Assessor | County's Appraiser (Massmann) | Archway's Appraiser (Bakken) | Tax Court Order |
|---|---|---|---|---|---|
| **Archway I** | | | | | |
| **2009** | - | $18,663,000 | $20,900,000 | $12,900,000 | $14,462,000 |
| **2010** | $19,700,000 | $18,326,000 | $18,600,000 | $12,700,000 | $11,531,000 |
| **Archway II** | | | | | |
| **2009** | - | $13,774,000 | $15,100,000 | $9,400,000 | $12,286,000 |
| **2010** | - | $12,000,000 | $14,300,000 | $9,200,000 | $9,811,000 |
| **2012** | $18,870,051 | - | - | - | - |

---

[1]    The County does not dispute that Archway overcame the prima facie validity of the county assessor's valuation.

All of the tax court's valuations were within the range of values proposed by the parties, except that the tax court's valuation of Archway I as of January 2, 2010, was lower than the values proposed by the parties and the county assessor. More significantly, all of the tax court's valuations were far lower than the actual sale price of each property.

The County appealed the tax court's decision, contending that the court provided inadequate reasons for rejecting Massmann's sales comparison analysis and for rejecting much of the data underlying Massmann's income capitalization analysis.

We will not overturn a tax court's valuation of real property unless the valuation is clearly erroneous. *Equitable Life Assurance Soc'y*, 530 N.W.2d at 552. The tax court's valuation is clearly erroneous when "the evidence as a whole does not reasonably support the decision," *Lewis v. Cty. of Hennepin*, 623 N.W.2d 258, 261 (Minn. 2001), and we are "left with a definite and firm conviction that a mistake has been committed," *KCP Hastings, LLC v. Cty. of Dakota*, 868 N.W.2d 268, 273 (Minn. 2015) (internal quotation marks omitted). But "we will not defer when the tax court has 'clearly overvalued or undervalued the property, or has completely failed to explain its reasoning.' " *Beck v. Cty. of Todd*, 824 N.W.2d 636, 639 (Minn. 2013) (quoting *Harold Chevrolet, Inc. v. Cty. of Hennepin*, 526 N.W.2d 54, 58 (Minn. 1995)). Accordingly, when the tax court arrives at a value that is higher or lower than the range of values proposed by either party, the tax court "should carefully explain its reasoning for rejecting the appraisal testimony and the grounds for adopting a lower or higher value, and adequately describe the factual support in the record for its determination." *Eden Prairie Mall, LLC v. Cty. of Hennepin*, 797

5

N.W.2d 186, 194 (Minn. 2011); *accord Guardian Energy, LLC v. Cty. of Waseca*, 868 N.W.2d 253, 263-64 (Minn. 2015). We have warned that when the tax court fails to take these analytical steps, "it runs the risk of having its determination overturned." *Eden Prairie Mall*, 797 N.W.2d at 194.

## II.

We first consider the tax court's rejection of Massmann's sales comparison analysis, which led the tax court to rely solely on the income capitalization approach in valuing Archway I and II. The three valuation approaches "are neither exclusive nor mandatory upon either the assessor or the factfinding court." *Equitable Life Assurance Soc'y*, 530 N.W.2d at 554 (quoting *Alstores Realty, Inc. v. State*, 286 Minn. 343, 352, 176 N.W.2d 112, 118 (1970)). The tax court may rely on a single method of appraisal when the other methods are not supported by accurate and reliable data. *See Nw. Racquet Swim & Health Clubs, Inc. v. Cty. of Dakota*, 557 N.W.2d 582, 587-88 (Minn. 1997). But, whenever possible, the tax court should employ at least two methods to determine the market value of a property, because the different methods can serve as checks on each other. *Am. Express Fin. Advisors, Inc. v. Cty. of Carver*, 573 N.W.2d 651, 657 (Minn. 1998). When the tax court solely relies on one method, as here, it must "clearly explain the weaknesses of the rejected approaches." *Equitable Life Assurance Soc'y*, 530 N.W.2d at 554-55.

When a market exists for a property, an analysis of that market provides the most straightforward way to support an opinion of market value. *Continental Retail, LLC v. Cty. of Hennepin*, 801 N.W.2d 395, 402 (Minn. 2011). Thus, the sales comparison

approach values property based on the sale price paid "in actual market transactions of comparable properties," with adjustments to the sale price as needed to reflect differences between the comparable property and the subject property. *Id.* Massmann selected five real estate sales—including the sales of the two subject properties—to use as comparables in his analysis. The tax court found that three of these sales comparables were entitled to no weight, then summarily rejected the remaining two. We address these sales comparables in turn, beginning with those the tax court addressed in detail.[2]

*Sales Comparable 2 (Uponor Distribution Center)*

Massmann used the sale of the Uponor Distribution Center in Lakeville as Sales Comparable 2. Massmann acknowledged that this sale took place between related parties who were originally partners in a joint venture, but he explained that the partners were planning to dissolve the partnership and that, after the property had been placed on the market, one of the partners ultimately decided to purchase the property.

Sales between related parties, such as partners in a joint venture, generally are not indicative of market value. *See* Appraisal Institute, *The Appraisal of Real Estate* 410 (14th ed. 2013); *cf. Lewis & Harris v. Cty. of Hennepin*, 516 N.W.2d 177, 179 (Minn. 1994) (explaining that some comparables "were not arms-length transactions which reflected actual market value"). But Massmann's report explained that both the

---

[2]    Archway's expert, Bakken, did not perform a sales comparison analysis for 2009, and the tax court gave no weight to or otherwise rejected the sales comparables Bakken offered to support his 2010 analysis. Archway did not appeal these determinations, and thus we are concerned only with the tax court's consideration of the County's sales comparison analysis.

buyer and the seller were publicly traded real estate investment trusts. To satisfy its investors, the seller needed to ensure that the property sold at market value. Accordingly, the parties based their sale price on discussions with brokers, who confirmed that the sale price was consistent with the value of the property in the current marketplace. Based on these facts, Massmann concluded that Sales Comparable 2 was representative of an arm's-length market transaction.

Yet, "[a]fter a review of the record," the tax court found that Massmann "did not overcome the presumption that [Sales Comparable 2] was not an arm's length transaction." The tax court did not discuss the evidence in the record or explain how Massmann could have overcome the tax court's presumption that Sales Comparable 2 "was not an arm's length transaction." The court neither evaluated Massmann's credibility nor discussed the relevance of the fact that both the buyer and the seller were publicly traded real estate investment trusts. Rather, the tax court simply restated the point Massmann had acknowledged—that Sales Comparable 2 was a related-party sale— without addressing Massmann's reasons for concluding that the transaction was nevertheless indicative of actual market value.

*Sales Comparable 3 (Archway I)*

Massmann used the 2010 sale of Archway I itself as the third comparable, reporting that the property "was listed by" a commercial real estate company and that the "[b]uyer and seller both stated the sale was an open market, arm's-length deal that was exposed to the market." Massmann observed that the tenants guaranteed the lease in 2006, which potentially could have affected the sale price. But Massmann reported that

8

the "[b]uyer stated the guarantee did not affect the sale price" and that the buyer "viewed [the local market] as stable with anticipated near term demand."

The tax court rejected Sales Comparable 3 due to its "unusual financing," which "Massmann did not adequately address . . . in his appraisal or trial testimony." Based on our careful review of the record, we conclude that the tax court's determination is contrary to the evidence. Massmann was aware of the financing, and he described the steps he took to verify that the transaction was nonetheless at arm's length. Put differently, the tax court did not identify any additional facts or analysis that Massmann needed to provide in order to "adequately address the property's unusual financing."

Moreover, Sales Comparable 3 was the 2010 sale of Archway I itself. Although the sale price of the subject property should not be conclusive, it is an important fact to consider when valuing real estate. *Minn. Entm't Enters., Inc. v. State*, 306 Minn. 184, 188, 235 N.W.2d 390, 393 (1975). The tax court did not address the fact that it was rejecting one of the subject properties, nor did the tax court explain why it was impossible to adjust for what it called "unusual financing" in the subject transaction.

*Sales Comparable 4 (Cardinal Health)*

Sales Comparable 4 was the 2011 sale of the Cardinal Health warehouse in Champlin. Cardinal Health was originally part of a national portfolio of properties, but the buyer elected to purchase Cardinal Health in conjunction with only one other property—in other words, as part of a smaller portfolio. According to Massmann, the "[b]uyer stated the sale was an open market, arm's length deal that was exposed to the market."

9

At trial, Archway confronted Massmann with a report of the Assessor Commercial Exchange, which listed the code "allocated sale price" next to this transaction.[3] Massmann explained that this code indicates that the sale included more than one property and that the sale price of the entire portfolio is allocated between the individual properties to arrive at an allocated sale price for each property. Although Massmann testified that he had researched the sale, when asked whether he had verified the sale of the national portfolio, Massmann said that he had not.

On rebuttal, Massmann explained that he had verified with the buyer that Sales Comparable 4 was valued independently from the other property the buyer also purchased. Yet, the tax court rejected Sales Comparable 4, in part because "Massmann did not verify the sale." The tax court did not discuss Massmann's testimony regarding his verification with the buyer. The County argues that the tax court misconstrued Massmann's testimony that he did not verify the *whole* sale—i.e., the national portfolio. Archway contends that the tax court did not err, because Massmann should have verified the sale of the national portfolio.

We conclude that the tax court should have addressed Massmann's testimony that he verified the sale. The tax court may have found Massmann's verification to be

---

[3]  The County argues that the tax court erroneously relied on a code used by the Assessor Commercial Exchange (ACE) to reject Massmann's sales comparables. We read the tax court's order differently. The tax court did not rely on the rejection code but cited the ACE reports for the propositions stated therein. The tax court's error was not in citing the ACE reports; rather, the court erred by failing to explain why Massmann's testimony did not adequately address the concerns raised by these reports, particularly because Massmann testified that the ACE rejection code has limited relevance.

insufficient, as Archway contends. But we cannot determine from the tax court's order whether Massmann's testimony was rejected or simply overlooked.

*The Remaining Two Comparables*

Massmann's remaining two comparables were Sales Comparable 1 (the Walgreens Distribution Warehouse in Rogers) and Sales Comparable 5 (Archway II, one of the subject properties). The tax court rejected these two comparables without any individual analysis. Although the tax court did not discuss any issues with these specific properties, the court implied that its rejection was based on a credibility determination, stating, "Given the issues that we have previously identified with Massmann's market analysis, we are unwilling to derive market values for the subject properties from the analysis of only two comparable sales."

Ordinarily, we defer to the tax court's credibility determinations. *Eden Prairie Mall, LLC v. Cty. of Hennepin*, 830 N.W.2d 16, 21 (Minn. 2013). But here, the credibility determination was based on the unexplained rejection of three other sales comparables. Indeed, the rejection of the last two comparables was not based on the individual characteristics of those properties but rather the putative weaknesses of three other unrelated comparable properties relied upon by Massmann.

And, significantly, Sales Comparable 5 was the recent sale of one of the subject properties. Although the sale of the subject property is not conclusive, it is evidence that is "reasonably . . . relied upon" and may be "one of the most important elements to be considered" when valuing real property. *Minn. Entm't Enters.*, 306 Minn. at 188, 235

11

N.W.2d at 393. Yet, the tax court rejected Sales Comparable 5 (Archway II) without explanation. This is an omission that we cannot overlook.

In conclusion, the tax court's decision to reject Massmann's sales comparison approach was contrary to the evidence and not supported by adequate reasoning. Accordingly, we remand to the tax court to more fully explain its reasoning. We leave it to the tax court to determine whether to reopen the matter for an evidentiary hearing.

### III.

We now turn to Massmann's income capitalization analysis. Although the tax court's final valuation was solely based on the income capitalization approach, the tax court rejected much of the income capitalization data presented by the appraisers.[4]

The income capitalization approach is an analysis of a property's capacity to generate future income. Appraisal Institute, *supra*, at 439. Because Archway I and II are leased properties, market rent is the relevant measure of income. *See Eden Prairie Mall*, 797 N.W.2d at 195. Thus, the first step in an income capitalization analysis is to calculate the market rents of Archway I and II. *See id.*; *see also* Appraisal Institute, *supra*, at 465-66. The second step is to calculate a capitalization rate, which converts the expected rental income into an indication of value. *See Eden Prairie Mall*, 830 N.W.2d at 23.

---

[4] The tax court also rejected many of Bakken's lease comparables and the entirety of Bakken's capitalization rate analysis. Archway did not appeal any of these determinations.

The County raises three issues related to Massmann's income capitalization analysis: (1) the tax court's rejection of three of the lease comparables that Massmann had used to calculate market rent; (2) the tax court's rejection of four of Massmann's capitalization comparables, which Massmann had used to calculate a capitalization rate; and (3) the tax court's reliance on survey data to calculate its own capitalization rate. We address each issue in turn.

A.

We begin with the first step of Massmann's income capitalization analysis—calculation of market rent. Market rent, or the rent that could be obtained in the open market, may be different than the actual rent negotiated by the parties to a lease. *See* Appraisal Institute, *supra*, at 447-51. To calculate the market rent of the subject property, an appraiser often gathers, compares, and adjusts rental data from comparable properties. *See id.* at 466. As with sales comparables, lease comparables should reflect arm's-length transactions. *See Eden Prairie Mall*, 797 N.W.2d at 195; *see also* Appraisal Institute, *supra*, at 466 (stating that "lease renewals or extensions negotiated with existing tenants should be used with caution" because existing tenants may be willing to pay higher rents to avoid relocating or may be offered lower rents to avoid vacancies).

Massmann relied on eight lease comparables to calculate market rent. The tax court rejected five of Massmann's lease comparables, as well as several of Bakken's lease comparables, and used the remaining lease comparables of both appraisers to complete its own income capitalization analysis.

13

The County challenges the tax court's decision to reject three of Massmann's lease comparables.[5] But these three comparables were lease renewals, and Massmann's own report acknowledges that not all of them reflected market rent. Further, Massmann did not provide any support for using these lease renewals as comparables except for the statements of parties to the leases, and many of these statements contradicted the County's argument that the lease renewals were arm's-length transactions. On this record, we cannot say that the tax court erred in rejecting Massmann's lease comparables.

B.

We next address the tax court's rejection of the capitalization comparables that Massmann used to calculate a capitalization rate. A capitalization rate "capitalizes a single year's income expectancy into an indication of value." *Eden Prairie Mall*, 830 N.W.2d at 23. Capitalization rates are often derived from comparable market sales. Appraisal Institute, *supra*, at 493-95

To develop a capitalization rate, Massmann primarily relied on data from the sales of six comparable leased properties. Additionally, Massmann analyzed national and local survey data. The tax court rejected four of Massmann's capitalization comparables. After finding that the remaining two capitalization comparables did not "provide a large enough sample to determine a credible capitalization rate," the tax court rejected

---

[5] Although the County listed "lease comparables 4, 5, 6, or 7" in its brief, the County did not explain why the tax court erred in rejecting Lease Comparable 4, and it is unclear whether the County intended to appeal the tax court's rejection of Lease Comparable 4.

Massmann's income capitalization analysis entirely. The County appeals the tax court's rejection of Massmann's capitalization comparables.

First, the tax court rejected Capitalization Comparables 2, 3, and 4 because they were derived from the three sales comparables that the tax court had rejected earlier in its analysis. Capitalization Comparable 2 is the same property as Sales Comparable 2 (Uponor); Capitalization Comparable 3 is the same property as Sales Comparable 3 (Archway I); and Capitalization Comparable 4 is the same property as Sales Comparable 4 (Cardinal Health). Because we reverse the decision on these three sales comparables and remand for further explanation, the tax court may, in its discretion, decide to address its rejection of the three corresponding capitalization comparables.

Next, the tax court rejected Capitalization Comparable 5 because "Massmann was unable to verify many of his financial assumptions for the lease with the buyer." Without verification, the tax court was uncertain whether the information Massmann provided for Capitalization Comparable 5 was reliable. The County concedes that Massmann did not verify his financial assumptions with the buyer, but argues that the unverified information was irrelevant to Massmann's calculations.

The County's argument is not supported by Massmann's report. When introducing the capitalization comparables, Massmann stated that "[e]ach comparable[] will be presented with the corresponding components utilized to develop each rate." Moreover, the County's argument—that underlying financial assumptions are irrelevant to the calculation of capitalization rates—is not generally accepted. *See* Appraisal Institute, *supra*, at 495 ("Data [for capitalization rates] must be drawn from properties

that are physically similar to the property being appraised and from similar (preferably competing) markets. When a comparable property has significant differences, it may be afforded less weight or may be discarded entirely.").

The County concedes that Massmann did not verify his financial assumptions for Capitalization Comparable 5, and nothing in Massmann's report or testimony indicates that these underlying assumptions were irrelevant to his analysis. Accordingly, we conclude that the tax court did not err by rejecting Capitalization Comparable 5.

C.

Because the two remaining capitalization comparables would "not provide a large enough sample to determine a credible capitalization rate," the tax court "place[d] no weight on Massmann's market-derived capitalization rate." The tax court also rejected Bakken's capitalization rate. Having rejected each appraiser's capitalization rate, the tax court completed its income capitalization analysis based solely on survey data that both appraisers had used as secondary support.

According to *The Appraisal of Real Estate*, real estate surveys may be used in combination with other methods of calculating capitalization rates. Appraisal Institute, *supra*, at 499. But "surveys are generally used as support rather than as primary evidence of a capitalization rate." *Id.*; *see also Carson Pirie Scott & Co. (Ridgedale) v. Cty. of Hennepin*, 576 N.W.2d 445, 451 (Minn. 1998) (observing that the tax court's capitalization rate was based "in part" on expert opinions about a national survey of mall properties). The County challenges the tax court's reliance on the survey data, arguing that survey data is inferior to an analysis based on actual comparative sales.

16

Having rejected much of the underlying data relied on by both parties, the tax court was left with little to rely on but survey data. Because we conclude a remand is necessary, we need not decide whether the tax court erred by relying solely on survey data. On remand, however, the tax court may reconsider its rejection of Massmann's sales comparison analysis, as well as its rejection of Capitalization Comparables 2, 3, and 4. If it does so, the tax court may well find it unnecessary to rely solely on survey data.

IV.

To summarize, we conclude that the tax court failed to adequately explain its reasons for rejecting Massmann's sales comparison analysis and instead relying exclusively on the income capitalization approach. This error is compounded by the tax court's failure to address why its valuation is far below the actual sale price of each subject property. Archway I sold for a price of $19,700,000 in 2010; yet, the tax court valued Archway I at $11,531,000—59% of the actual sale price—for the valuation date of January 2, 2010. Similarly, whereas Archway II sold at $18,870,051 in 2012, the tax court valued it at $9,811,000—52% of the actual sale price—for the valuation date of January 2, 2010. Moreover, the tax court's estimate of the 2010 value of Archway I is below the estimates of both parties, as well as that of the Hennepin County Assessor. Accordingly, we reverse the portion of the tax court's decision that rejected Massmann's sales comparison analysis, vacate the tax court's order, and remand for further proceedings. We leave it to the tax court to decide whether to re-open the record on remand.

Reversed in part, vacated, and remanded.

CHUTICH, J., not having been a member of this court at the time of submission, took no part in the consideration or decision of this case.