STATE OF MINNESOTA

IN SUPREME COURT

A16-0415

| | |
|---|---|
| Tax Court | Chutich, J. |
| | Took no part, Stras, J. |
| Menard, Inc., | |
| | |
| Relator, | |
| | |
| vs. | Filed: November 9, 2016 |
| | Office of Appellate Courts |
| County of Clay, | |
| | |
| Respondent. | |

_____

Eric J. Magnuson, Katherine S. Barrett Wiik, Robins Kaplan L.L.P., Minneapolis, Minnesota; and

Robert A. Hill, Robert Hill Law, Ltd., Maplewood, Minnesota, for relator.

Brian J. Melton, Clay County Attorney, Jenny M. Samarzja, Chief Assistant County Attorney, Moorhead, Minnesota; and

Thomas J. Radio, Felhaber Larson P.A., Minneapolis, Minnesota, for respondent.

_____

S Y L L A B U S

1.  The tax court's finding that the highest and best use for the taxpayer's property was continued use as a big-box retail store was well supported by the record.

2.  The tax court's depreciation calculations using the cost approach were supported by the evidence in the record.

1

3. The tax court's determination that only three of the comparable sales offered by the parties were truly comparable was supported by the record.

4. The tax court's use of the cost approach and the way it weighted the cost and sales comparison approaches were within the tax court's broad discretion for determining the property's value because, whenever possible, the tax court should employ at least two methods to determine property value and a final determination of value may require that one approach be given greater emphasis.

Affirmed.

Considered and decided by the court without oral argument.

O P I N I O N

CHUTICH, Justice.

Relator Menard, Inc. appealed to the tax court from respondent Clay County's assessment of the market value of Menard's Moorhead home improvement retail store for the assessment dates of January 2, 2011; January 2, 2012; January 2, 2013; and January 2, 2014. Following a trial, the tax court adopted market valuations below the County's assessment values but above Menard's expert appraiser's valuation. Menard appealed.

In this appeal from the tax court's final order and judgment, Menard asserts that the tax court erred in several respects: (1) the tax court rejected Menard's expert appraiser's highest and best use determination, (2) the tax court made improper calculations when it determined the fair market value of the property using the cost approach, (3) the tax court used a "de facto averaging" of the cost approach and the sales comparison approach when

it determined the fair market value of the property, and (4) the tax court failed to adequately explain its reasoning.

The County also appealed, asserting that the tax court erred in its calculations and conclusions of value using the sales comparison and cost approaches. Because the tax court did not err in its findings and did not fail to adequately explain its reasoning, we affirm the tax court's value determinations.

I.

This appeal concerns the tax value of a Menards home improvement retail store in Moorhead as of January 2, 2011 through January 2, 2014. The store is located on a parcel of approximately 771,350 square feet with two structures. The first structure, the main building, consists of a single-story heated retail space with an additional mezzanine space and a covered and unheated garden center. The second structure is an open-air detached shed, used as a warehouse. Built in 2007, the structures were in good condition as of each assessment date, and are visible and accessible from the nearby interstate highway. The Clay County Assessor valued the property at $11,200,000 for all four assessment dates. Menard challenged these assessments, and a trial ensued before the tax court.

Menard retained Michael MaRous to prepare an appraisal and opinion as to market value, and Timothy Vergin prepared an appraisal and opinion as to market value on behalf of the County. MaRous conducted a sales comparison analysis and an income capitalization analysis as part of his appraisal, but ultimately relied on the sales comparison approach in his final valuation reconciliation. Vergin conducted a sales comparison analysis, an income capitalization analysis, and a cost analysis, assigning one-third weight

3

to each approach in his final valuation reconciliation. In their valuation conclusions, the appraisal experts differed as to a key point: the highest and best use of the subject property. MaRous concluded that the property was *not* viable as a big-box retail store if sold by Menard, while Vergin concluded that the property was viable as a big-box retail store.

Finding that Menard overcame the prima facie validity of the Clay County Assessor's valuation, the tax court then considered the appraisal opinions of each expert. The tax court rejected Menard's highest and best use determination and instead adopted the County's view that the highest and best use of the property as-vacant was commercial property and as-improved was continued use as a big-box retail store. The tax court rejected the County's income capitalization analysis.[1] After rejecting most of the comparable sales used in the parties' sales comparison analyses, and making adjustments to the sales price of the remaining comparables, then making adjustments to the parties' cost analyses, the tax court gave its cost approach calculation a 60-percent weighting and its sales comparison approach a 40-percent weighting for appraisal years 2011 and 2012. The tax court assigned each approach a 50-percent weighting for valuation years 2013 and 2014.

The parties moved for amended findings of fact and conclusions of law, but the tax court adjusted its order only to account for inaccurate calculations for physical deterioration and to grant Menard its unopposed request for equalization relief. The assessed values, appraised values, and the tax court's values for the property are as follows:

---

[1] The County did not appeal this determination.

| Appraisal Year | County Assessor | County's Appraiser (Vergin) | Menard's Appraiser (MaRous) | Tax Court Order | Tax Court Amended Order |
|---|---|---|---|---|---|
| 2011 | $11,200,000 | $12,000,000 | $4,000,000 | $7,432,100 | **$7,516,600** |
| 2012 | $11,200,000 | $12,300,000 | $4,000,000 | $7,585,800 | **$7,681,300** |
| 2013 | $11,200,000 | $12,500,000 | $4,000,000 | $7,219,000 | **$7,331,300** |
| 2014 | $11,200,000 | $12,700,000 | $4,000,000 | $7,393,600 | **$7,556,200** |

Menard appealed the tax court's decision, arguing that the tax court erred in rejecting MaRous's highest and best use determination, in its cost approach calculations, in averaging the sales comparison and cost approaches, and in failing to adequately explain its reasoning. The County also appealed, contending that the tax court erred in accepting parts of MaRous's appraisal report and testimony, in excluding post-sale expenditures and other comparable sales in its sales comparison approach, and in excluding indirect soft costs in its cost approach.

"Our review of [a] final order of the tax court is limited." *S. Minn. Beet Sugar Coop v. Cty. of Renville*, 737 N.W.2d 545, 551 (Minn. 2007). We will not overturn a tax court's valuation unless the valuation is clearly erroneous. *Equitable Life Assurance Soc'y of U.S. v. Cty. of Ramsey*, 530 N.W.2d 544, 552 (Minn. 1995). The tax court's valuation is clearly erroneous when "the evidence as a whole does not reasonably support the decision," *Lewis v. Cty. of Hennepin*, 623 N.W.2d 258, 261 (Minn. 2001), and we are "left with a 'definite and firm conviction that a mistake has been committed,' " *KCP Hastings, LLC v. Cty. of Dakota*, 868 N.W.2d 268, 273 (Minn. 2015) (quoting *Equitable Life Assurance Soc'y*, 530 N.W.2d at 552).

Our deferential review is rooted in the separation of powers and the inexact nature of real estate appraisal. *Cont'l Retail, LLC v. Cty. of Hennepin*, 801 N.W.2d 395, 399 (Minn. 2011). We have accepted even abbreviated explanations of the tax court's reasoning. *See Kohl's Dep't Stores, Inc. v. Cty. of Washington*, 834 N.W.2d 731, 734-35 (Minn. 2013); *Harold Chevrolet v. Cty. of Hennepin*, 526 N.W.2d 54, 58 (Minn. 1995) ("The inexact nature of property assessment necessitates that this court defer to the decision of the tax court."). We will reject the tax court's reasoning, however, when the tax court's decision is "clearly against the weight of the evidence," *Am. Express Fin. Advisors, Inc. v. Cty. of Carver*, 573 N.W.2d 651, 659 (Minn. 1998), or the tax court has "completely failed to explain its reasoning," *Nw. Nat'l Life Ins. Co. v. Cty. of Hennepin*, 572 N.W.2d 51, 52 (Minn. 1997).

## II.

We first consider the tax court's rejection of Menard's highest and best use determination. All property must be valued at its market value, Minn. Stat. § 273.11, subd. 1 (2014), which is the "usual selling price at the place where the property . . . shall be at the time of assessment," Minn. Stat. § 272.03, subd. 8 (2014). "Appraisers must perform a highest and best use analysis when appraising commercial real estate." *Berry & Co. v. Cty. of Hennepin*, 806 N.W.2d 31, 34 (Minn. 2011). Thus, the market value of property requires consideration of the property's highest and best use. *Cty. of Aitkin v. Blandin Paper Co.*, 883 N.W.2d 803, 810 (Minn. 2016); *see also* Appraisal Institute, *The Appraisal of Real Estate* 332 (14th ed. 2013) (explaining that a property's highest and best use is "[t]he reasonably probable use of property that results in the highest value"). The highest

and best use of a property is the one that is physically possible, legally permissible, financially feasible, and maximally productive. *Cty. of Aitkin*, 883 N.W.2d at 810.

Highest and best use analysis can be approached in two ways. The first assumes that the property is vacant or can be made vacant by demolishing present improvements. Appraisal Institute, *supra*, at 336; *see also Ferche Acquisitions, Inc. v. Cty. of Benton*, 550 N.W.2d 631, 634 (Minn. 1996) (explaining that highest and best use can consider "whether it would be best to sell [the property] vacant on the open market"). The second, "as-improved," focuses on the use of the property that should be made with its current improvements. Appraisal Institute, *supra*, at 336. As-improved analysis is narrower, focusing on whether to retain, modify, or demolish existing improvements. *Id.*

Both experts provided opinions on the highest and best use of Menard's property "as-vacant" and "as-improved."[2] MaRous found that the highest and best use of the property as-improved was continued use as a single-tenant retail building with Menard as its occupant-owner. But if Menard were to vacate the property, MaRous concluded that it was "highly likely the building would remain vacant." In other words, continued use as a big-box retail store was not viable for the property if Menard left. In reaching this conclusion, MaRous considered national economic conditions and trends, particularly regarding big-box retailers. These considerations include a nationwide oversupply of big-box properties; the impact of the 2008 recession on big-box retailers; a trend away from big-box retail, in part because of an increase in online retailing; and the superior "overall

---

[2] Menard appealed only the tax court's as-improved determination. We do not consider whether the tax court's as-vacant determination was clearly erroneous.

7

population and income demographics" in the Fargo, North Dakota market as compared to the Moorhead, Minnesota market.

Vergin found that, as-improved, the property and its improvements were suited to its current use as a big-box retail store. Vergin relied on evidence that showed no excess supply of vacant big-box stores in the local market and evidence that the 2008 recession impacted that market less than many other communities.

The tax court found that, for all valuation dates, the property's highest and best use as-improved was continued use as a big-box retail store. The tax court rejected MaRous's analysis because of its "general and abstract character," noting that he "never descended to [the required level] of particularity in concluding that the property was not a viable big box retail store." The tax court also rejected MaRous's conclusions regarding the impact of the 2008 recession on big-box stores in the Fargo/Moorhead area because MaRous recognized that the "magnitude and duration of the downturn depended a great deal on a number of factors including location [and] local demographics," a high growth rate, and a low unemployment rate. The record also included evidence that "home improvement stores are not as vulnerable to online sales" as other large retailers, and some big-box retailers are moving toward even larger facilities rather than downsizing.

Taking all these factors into consideration, the tax court found:

1. "Fargo/Moorhead had an unusually strong and stable economy . . . and the area was experiencing steady population and wage growth,"
2. "Moorhead's development of an eastward growth ring was proceeding much more quickly than anticipated,"
3. "[t]here was at most one vacant big box store[] in the entire Fargo/Moorhead area," and

8

4. "the subject property was a recently-constructed typical big-box store with both good visibility and recently augmented access from Interstate 94."

The record supports the tax court's findings. First, the tax court relied on population demographics, high growth, and a low unemployment rate in the Fargo/Moorhead area. Second, the tax court deemed Menard's Moorhead-specific analysis unpersuasive because it was based on national data that did not apply specifically to the property. The tax court acknowledged that Menard's retail sales at the property were less than those at its nearby store in North Dakota, but it noted that many big-box retailers have several locations, and even those big-box retailers located on the more prosperous side of the local market may still choose to build another store in the area. The tax court's determination—that the highest and best use of Menard's property was as a big-box retail store—was well supported by the record.

The County argues that once the tax court rejected MaRous's opinion on the highest and best use of the property, the tax court should have rejected MaRous's opinions entirely as unreliable. We disagree. "[T]he tax court typically determines the weight and credibility of . . . testimony, including that of the expert witnesses." *Beck v. Cty. of Todd*, 824 N.W.2d 636, 639 (Minn. 2013) (citation omitted) (internal quotation marks omitted). The tax court is free to "accept all or only part of any witness' testimony." *City of Minnetonka v. Carlson*, 298 N.W.2d 763, 767 (Minn. 1980). MaRous offered evidence and opinions on many elements relevant to the proper valuation of the property. Although the tax court found that MaRous's highest and best use determination was unreliable, it did not find that his entire report was unreliable. Given our deferential review of credibility determinations,

9

*Eden Prairie Mall, LLC v. Cty. of Hennepin*, 830 N.W.2d 16, 21 (Minn. 2013), we conclude that the tax court acted well within its broad discretion in relying on portions of MaRous's appraisal report and testimony.

III.

Next, we review the parties' objections to the tax court's calculations under the cost approach. We recognize three approaches for determining the market value of real estate: the sales comparison approach; the income capitalization approach; and the cost approach. *See Equitable Life Assurance Soc'y of U.S. v. Cty. Of Ramsey*, 530 N.W.2d 544, 552 (Minn. 1995).[3] The cost approach assumes that "an informed buyer would pay no more for the property than the cost of constructing new property having the same utility." *Id.*

"Under [this] approach, the appraiser determines the current cost of constructing the existing improvements on the property, subtracts depreciation to determine the current value of the improvements, and then adds the value of the land to determine the market value." *Cont'l Retail LLC v. Cty. of Hennepin*, 801 N.W.2d 395, 403 (Minn. 2011). This approach "is useful for estimating the market value of new or relatively new construction . . . and . . . is best applied when land value is well supported and the improvements are new or suffer only minor depreciation." *Guardian Energy, LLC v. Cty. of Waseca*, 868 N.W.2d 253, 262 (Minn. 2015).

---

[3] The parties' appraisers used an income capitalization approach, although MaRous ultimately relied on the sales comparison approach. The County does not challenge the tax court's decision that it had "no reliable market value indication under the income capitalization approach."

The tax court first determined a value for the property site by considering comparable sales transactions, then adjusted the resulting value figure for the cost of improvements and a 10-percent entrepreneurial incentive, and finally adjusted for depreciation, including functional and external obsolescence. Menard challenges three elements of the tax court's analysis: (1) adjusting for a 10-percent entrepreneurial incentive, (2) rejecting MaRous's market extraction theory for calculating total depreciation, and (3) refusing to adjust for external obsolescence. The County raises one issue related to the tax court's cost analysis: error in excluding indirect soft costs when adjusting for improvements. We address each issue in turn.

A.

We begin with the tax court's adjustment to the site value using a 10-percent entrepreneurial incentive. Entrepreneurial incentive is "[t]he amount an entrepreneur expects to receive for his or her contribution to a project. . . . [I]t is the expectation of future profit as opposed to the profit actually earned on development or improvement." Appraisal Institute, *supra*, at 573. Entrepreneurial profit is a "market derived figure that represents the amount an entrepreneur receives for his or her contribution to a project and risk; the difference between the total cost of a property . . . and its market value." *Id.*

Menard asserts that adjustment for an entrepreneurial incentive was improper because the property is owner-occupied rather than for sale or other use. But this factor is not determinative. *See, e.g.*, *Nw. Racquet Swim & Health Clubs, Inc. v. Cty. of Dakota*, 557 N.W.2d 582, 585 (Minn. 1997) (explaining adjustments made to land value for operating a health club, including "a five percent entrepreneurial profit"). "Some

11

appraisers . . . observe that entrepreneurial profit often represents a theoretical profit in build-to-suit, owner-occupied properties. The owner-occupant may consider any additional operating profit due to the property's efficient design to be an incentive." Appraisal Institute, *supra*, at 575. This profit "might only be realized years after the property is built when it sells to a similar owner-occupant at a premium because the property is suitable and immediately available, unlike new construction or conversion of a different property." *Id.*

MaRous did not include an entrepreneurial incentive in his calculations, noting that "[i]n the subject's case, and like virtually all big box retail stores, consideration for entrepreneurial profit is not applicable." Vergin, on the other hand, included a 10-percent entrepreneurial incentive in his cost approach calculations, explaining that he added that sum because it "is compensation to the entrepreneur for . . . going at risk to build the asset."

The tax court agreed with Vergin, relying on the principle that "any building project will include an economic reward (above and beyond direct and indirect costs) sufficient to convince an entrepreneur to take on the risk associated with that project in that market." *See* Appraisal Institute, *supra*, at 573. Although we may have come to a different conclusion had we been the initial fact-finder, the tax court's decision has support in the record, and we are not left with a definite and firm conviction that an error was committed.

B.

We next address the County's assertion that the tax court failed to account for all indirect soft costs in its adjustments to property value. Soft costs are those costs "generally

12

related to the size and cost of the project," including indirect soft costs such as "architectural fees and property taxes." Appraisal Institute, *supra*, at 572.

The parties' experts compared Menard's actual 2007 costs—when the buildings were constructed and the land was improved—with the estimated costs provided by a valuation service, Marshall & Swift Valuation Service (Marshall & Swift). The tax court found errors in Vergin's calculations, noted that MaRous's adjustments to actual site-improvement costs were "unchallenged by the County," and based on the evidence in the record, preferred MaRous's cost calculations. The County asserts that this decision is erroneous because MaRous admitted that he did not know what the soft costs were for the 2007 project, and Menard's cost statement did not identify any soft costs.

Although the tax court acknowledged that MaRous's actual cost figures did not include soft costs, it nonetheless found that those estimates were "reasonably close" to the adjusted Marshall & Swift estimate. On the other hand, the tax court found that Vergin's cost calculations were incorrect and "not sufficiently justified to warrant reliance." Further, Vergin's estimated costs based on the Marshall & Swift information were "substantially above the indexed actual cost."

These findings have ample support in the record. Given the tax court's explanation for accepting MaRous's cost adjustments and rejecting Vergin's, we conclude that the tax court's adjustments for soft costs were well supported by record evidence.

C.

We now turn to Menard's challenges to the tax court's deductions for depreciation. Depreciation represents "losses in the value of improvements due to the effects of age,

13

wear and tear, and other causes." Appraisal Institute, *supra*, at 576. Three major causes of depreciation exist: physical deterioration, functional obsolescence, and external obsolescence, all of which can operate separately or in combination. *Id.*; *see also Guardian Energy*, 868 N.W.2d at 262 (describing the "three forms of depreciation under the cost approach"). Menard contends that the tax court erred in its depreciation adjustments by rejecting the market-extraction method that MaRous used to calculate functional obsolescence and by concluding that the property suffered no external obsolescence.

We begin with Menard's argument regarding the market-extraction method used to calculate depreciation.[4] The market-extraction method "relies on the availability of comparable sales from which depreciation can be extracted," but it is used only when "the quality of th[e] data is adequate to permit meaningful analysis." Appraisal Institute, *supra*, at 605. This "method is difficult to apply when the type or extent of depreciation varies greatly among the comparable properties due to characteristics other than age." *Id.* at 610.

Relying on data drawn from 27 separate sales transactions, MaRous used the market-extraction method to "test the reasonableness of [his] total depreciation estimate," which was 79 percent or 80 percent for each year. The tax court identified several concerns with MaRous's comparable transactions. First, most of the primary comparables—a group of seven in-state transactions—were not comparable in age. Second, comparables similar

---

[4]     Total depreciation can be calculated using any of the following, either individually or in combination: the market-extraction method, the economic age-life method, or the breakdown method. Appraisal Institute, *supra*, at 597. Menard's expert used a "modified" economic age-life method and a market-extraction method for estimating total depreciation. Only the market-extraction method is at issue on appeal.

in age were closed for "insufficient sales," suggesting that the "depreciation at these stores may well be attributable to external obsolescence not shared by the subject property." Finally, two of the older stores that were sold had been replaced by newer stores, suggesting that any depreciation was attributable to factors not shared by the Menard's store. Thus, the tax court concluded that "MaRous's application of market extraction to the primary set was inappropriate, and his results unreliable."

Menard argues that the tax court improperly speculated about the accuracy of MaRous's depreciation analysis and erroneously substituted its own view of comparability. *See Guardian Energy*, 868 N.W.2d at 266 (noting that the tax court cannot "substitute its own measure of external obsolescence that is without support in the record"). In *Guardian Energy*, the tax court calculated external obsolescence "with virtually no record support or explanation" after rejecting a factor "that both parties' appraisers found to be the primary consideration." *Id*. In contrast, the tax court's decision here was based on identified concerns with the lack of comparability in the transactions relied on, and inconsistencies between, Menard's "occupancy-only" theory of big-box retailers and the offered comparables. After considering these issues, the tax court concluded that MaRous's "implementation" of the market-extraction method did not provide reliable results.

Based on the entire record, we conclude that the tax court's decision to reject MaRous's market-extraction analysis was supported by the record.

D.

Menard also challenges the tax court's finding that Menard's Moorhead store suffered no external obsolescence on any of the valuation dates. External, or economic,

15

obsolescence "is the measurement of a property's loss in value as a result of factors beyond the physical boundaries of the property and beyond the owner's control." *Guardian Energy*, 868 N.W.2d at 262-63; *see also In re McCannel*, 301 N.W.2d 910, 924 n.10 (Minn. 1980) (defining economic obsolescence as an "impairment of desirability or useful life arising from factors external to the property").

MaRous estimated external obsolescence at 10 percent, relying on "the on-going recession and . . . its adverse and significant impact on all segments of the real estate market." Menard also presented evidence regarding the inferiority of the Moorhead area on the Minnesota side of the river, as compared with the Fargo area on the North Dakota side, in terms of "population and income market demographics," as well as a "glut of vacant big-box retail stores." The tax court found that the property suffered from no external obsolescence and noted that Menard's 10-percent estimate was "based exclusively on broad generalizations and on national rather than local data" and the specific property.

Menard failed to present any evidence showing that online sales have affected lumber and home improvement stores and that nationwide economic trends produced external obsolescence in Moorhead.[5] Menard also failed to address evidence showing that some big-box retailers are building even larger big-box stores. In addition, Peter Doll, a witness for the County who values property for tax purposes and is involved in economic development, testified to the strong market for large retail stores in the Moorhead market.

---

[5] Specifically, during the valuation period the Fargo/Moorhead area had an unusually strong and stable economy compared with many other communities; the area was experiencing steady population and wage growth; and there was, at most, one vacant big-box store in the Fargo/Moorhead area.

16

On this record, the tax court's finding that the subject property suffered no external obsolescence was not clearly erroneous. *See Nw. Racquet Swim & Health Clubs*, 557 N.W.2d at 588 (finding a tax court's decision on economic obsolescence that had "evidentiary support" and was "not unreasonable" was not clearly erroneous).

In conclusion, the tax court's calculations under the cost approach were supported by the record. Therefore, we affirm the tax court's cost approach calculations.

IV.

We next consider the County's challenges to the tax court's calculations in its sales comparison approach. The sales comparison approach involves valuing property "based on the price paid in actual market transactions of comparable properties, and then [making] an adjustment to those sales prices . . . to reflect differences between the sold property and the subject property." *Cont'l Retail LLC v. Cty. of Hennepin*, 801 N.W.2d 395, 402 (Minn. 2011); *see Carson Pirie Scott & Co. (Ridgedale) v. Cty. of Hennepin*, 576 N.W.2d 445, 447 (Minn. 1998) (explaining that adjustments are made "for differences such as location, size and time of sale" after comparing the subject property with comparable sales). "A major premise of the sales comparison approach is that an opinion of the market value of a property can be supported by studying the market's reaction to comparable and competitive properties." *Cont'l Retail*, 801 N.W.2d at 402 (quoting Appraisal Institute, *The Appraisal of Real estate* 297 (13th ed. 2008)). A tax court does not err by rejecting a valuation under the sales comparison approach where noncomparable sales are used. *KCP Hastings LLC v. Cty. of Dakota*, 868 N.W.2d 268, 274 (Minn. 2015).

17

The County raises two challenges to the tax court's sales comparison analysis. First, the County argues that the tax court improperly rejected several of its comparable sales simply because those transactions were not also considered by Menard's expert, MaRous. Second, the County objected to the tax court's adjustment to exclude post-sale costs incurred in the transaction for Lowe's-Cambridge.

The County's expert, Vergin, considered eleven comparable transactions, using a gross building area of 236,429 square feet, which included the main building, the mezzanine space, the covered and unheated space, and the detached open-air shed. MaRous considered seven transactions using a gross building area of 162,340 square feet, which comprised the main building's enclosed, heated space and excluded the mezzanine and covered, unheated space.

The tax court, using MaRous's gross building area of 162,340 square feet, agreed with MaRous that the main building's covered and unheated space and the detached open-air shed "would likely have 'very little contributory impact on value' " and that "the '[m]ore appropriate treatment of this space may be achieved by . . . applying an upward adjustment' for the excluded spaces." The tax court noted that "Vergin agreed that [the] market would not attach any value" to the mezzanine space.

The tax court also noted that the property was unique, and "[a] significant factor in the selection of sales comparables . . . is the main building's . . . covered/unheated space, and the property's . . . detached open-air shed." With this standard in mind, the tax court identified four comparable sales transactions the appraisers had in common. Three of those common sales had similar covered and unheated space, were relatively close in gross

18

building area (excluding covered and unheated space), and had sale dates in late 2012— close to the center of the four valuation dates. Given these similarities to the property, the tax court used these three transactions as comparable sales transactions.

The County argues that the tax court should have included three of its offered transactions because they are "very comparable" and require "the least amount of adjustment." We will not disturb the tax court's decision to rely on some, but not all, offered comparables. *See KCP Hastings*, 868 N.W.2d at 273-74. The tax court explained its reasons for including the comparables that it used, and in particular, noted that the similarities between the three chosen comparables and the subject property "reduce the need for adjustment." Given this explanation and reasoning, we find the tax court's explanation was adequate and its decision was supported by the record.

The County argues that the tax court should have excluded the Lowe's-Rogers sale (comparable No. 5), even though the County relied on this transaction, because the sale "had severe use restrictions in place." Based on a limited-use restriction in the warranty deed for comparable No. 5, the tax court adopted a 15-percent adjustment for each valuation date, finding that a use restriction "imposes a genuine constraint on the . . . property for seven years." The County contends that the use restriction adjustment Vergin proposed—75 percent—had more support in the record than the 5-percent adjustment that MaRous proposed. The tax court considered both experts' testimony and evidence, rejected Vergin's speculation about the effect of the use restriction for comparable No. 5, and determined that a 15-percent adjustment adequately reflected the constraint imposed by the restriction, which was "limited in both scope and duration." We do not disturb the

19

tax court's determinations on comparable transactions, particularly when credibility determinations are at issue, *see Archway Mktg. Servs. v. Cty. of Hennepin*, 882 N.W.2d 890, 896 (Minn. 2016), and we do not do so here.

We next consider the County's objection to the tax court's exclusion of post-sale costs incurred in the transaction for Lowe's-Cambridge. Post-sale costs, such as costs to "demolish and remove a portion of the improvements," can be added to the sales price of a comparable property if the buyer and the seller have anticipated such costs. Appraisal Institute, *supra*, at 412-13. In the Lowe's-Cambridge transaction, the Lowe's property was purchased by Mills Fleet Farm, which then incurred expenses to remove Lowe's trade-dress improvements from the property.

No evidence in the record shows, however, that Lowe's anticipated the $2.8 million that Mills Fleet Farm spent to remove Lowe's trade dress and to construct its own. Here, Vergin was questioned at length during the trial as to whether Lowe's knew of the $2.8 million that Mills would have to spend. After a lengthy exchange, the appraiser agreed that "[Lowe's] may not have known what was going to be spent by . . . Mills." Because evidence of actual assumptions made by Lowe's regarding post-sale costs is not in the record, the tax court did not clearly err by declining to consider those costs as part of its calculations under the sales comparison approach.[6]

---

[6] The tax court characterized post-sale costs as functional obsolescence under the cost approach. Functional obsolescence is the "inadequacy or obsolescence of a facility due to developments which have made it incompetent to perform its function properly or economically, . . . or the inability of a structure to perform adequately the function for which it is currently employed." *In re McCannel*, 301 N.W.2d 910, 924 n.9 (Minn. 1980). "[E]xpensive trade dress [that is] so important to [one big-box retailer] represents

20

V.

Finally, we consider the objection by Menard to the tax court's weighting of the cost approach and the sales comparison approach. The tax court weighted the cost approach at 60 percent and the sales approach at 40 percent for the first two years. It did so after concluding that it had "no reliable market value" information for the income capitalization approach, the "cost approach is well supported and . . . appropriately used," and the "sales comparison approach likewise produces reliable indications of market value." For the final two years, the tax court gave the two approaches equal weight. This "math," Menard contends, "divorces market value" from its intended objective, identifying the price that a purchaser would be willing to pay for the property.

All real property is assessed based on market value, that is, the price at which property could be sold at a private sale. Minn. Stat. §§ 273.11, subd. 1, 272.03, subd. 8 (2014). We have said that the "sale value [of property], not the actual value, is what must control" any determination of market value. *State v. Russell-Miller Milling Co.*, 182 Minn. 543, 544, 235 N.W. 22, 22 (1931). The tax court need not, however, "accept any particular valuation approach as the sole basis for determining market value." *DeZurik Corp. v. Cty. of Stearns*, 518 N.W.2d 14, 16 (Minn. 1994). Whenever possible, the tax court should

---

functional obsolescence when the property is put on the open market." David Charles Lennhoff, *Valuation of Big-Box Retail for Assessment Purposes: Right Answer to the Wrong Question*, 39 Real Estate Issues, no. 1, 2014, at 21, 25. Because these post-sale improvements (removal of expensive trade dress) fit within the definition of functional obsolescence, the tax court did not clearly err when it considered these post-sale improvements as a form of depreciation under the cost approach and applied a similar deduction to the Menard property.

21

employ at least two methods to determine the market value of a property because the different methods can serve as checks on each other. *Am. Express Fin. Advisors v. Cty. of Carver*, 573 N.W.2d 651, 657 (Minn. 1998). In a given valuation determination, more than one approach to value is usually appropriate and necessary. *See* Appraisal Institute, *supra*, at 77; *Equitable Life Assurance Soc'y of U.S. v. Cty. of Ramsey*, 530 N.W.2d 544, 553-54 (Minn. 1995). We "accord the tax court broad discretion in choosing which valuation approach to use." *Evans v. Cty. of Hennepin*, 548 N.W.2d 277, 278 (Minn. 1996). Further, we have recognized that "the weight given to each approach depends on the quantity and quality of available data." *KCP Hastings LLC v. Cty. of Dakota*, 868 N.W.2d 268, 275 (Minn. 2015) (citation omitted) (internal quotation marks omitted).

Menard contends that the tax court's job was done once it determined that the sales comparison approach provided a reliable indicator of market value. The sales comparison approach "must be given the full weight it legally deserves" according to Menard. If by this declaration Menard insists that the tax court erred by failing to rely on the sales comparison approach alone, we have already rejected this argument. We have said that "appraisal is an inexact value determination" and an "estimate of value." *Lewis & Harris v. Cty. of Hennepin*, 516 N.W.2d 177, 180 (Minn. 1994).

Thus, we have allowed the tax court to determine market value by considering more than one approach. *See id.* ("Viewing value from three different perspectives may help the appraiser arrive at an estimate closer to actual market value than if the property were viewed from a single perspective."); *see also Am. Express Fin. Advisors*, 573 N.W.2d at 657 ("We have stated that whenever possible, the court should apply at least two

22

approaches to market value because the alternative value indications derived can serve as useful checks on each other.").

Menard further asserts that the tax court erred in its decision by giving the cost approach and the sales comparison approach varying weights when determining market value and by failing to explain its reasoning. We disagree.

"The respective weight placed upon each of the three traditional approaches to value depends on the reliability of the data and the nature of the property being valued." *Harold Chevrolet v. Cty. of Hennepin*, 526 N.W.2d 54, 59 (Minn. 1995). "No mechanical formula is used to select one [valuation approach] over the others. The strengths and weaknesses of each approach used must be discussed, and the appraiser must explain why one approach may be relied upon more than another . . . ." Appraisal Institute, *supra*, at 642. Indeed, we have allowed "overriding weight" to be given to one approach when weaknesses in the other two approaches are identified. *Montgomery Ward & Co. v. Cty. of Hennepin*, 482 N.W.2d 785, 791 (Minn. 1992).

To be sure, the tax court must provide adequate reasoning for its valuation determinations. *Archway Mktg. Servs. v. Cty. of Hennepin*, 882 N.W.2d 890, 897 (Minn. 2016) (finding that the tax court's *unexplained* rejection of several sales comparables required remand). But we have accepted even abbreviated explanations of the tax court's reasoning. *See Kohl's Dep't Stores Inc. v. Cty. of Washington*, 834 N.W.2d 731, 734-35 (Minn. 2013).

In its final reconciliation, the tax court found that "the cost approach [was] well supported and [was] appropriately used give[n] the recent vintage of the subject property's

improvements." The tax court also found that the sales comparison approach "produces reliable indications of market value." The tax court determined that, for the 2011 and 2012 valuation dates, it was appropriate to give the cost approach 60-percent weight and the sales comparison approach 40-percent weight because "the subject property's improvements were only four years old on the first valuation date." The tax court gave the sales comparison approach and the cost approach equal weighting (50 percent each) for the 2013 and 2014 valuation dates.

The tax court provided a reasonable explanation of the circumstances that justified the use of the cost approach. First, the tax court found that because the property was "relatively new construction," substantial reliance on the cost approach was proper. *See Guardian Energy LLC v. Cty. of Waseca*, 868 N.W.2d 253, 262 (Minn. 2015). Second, the tax court noted that there was "no reliable market value indication under the income capitalization approach," so its reliance on the cost approach and the sales comparison approach "became relatively more important." *See Equitable Life Assur. Soc'y*, 530 N.W.2d at 553.

Third, the tax court reiterated that it had "substantial misgivings about the comparable sales in this case," and this concern with Menard's comparable sales affected the tax court's "confidence in, and final weighting of, the sales comparison approach." Specifically, the tax court stated that "Menard's occupancy-only theory necessarily suggests that sales of big box retail stores are extraordinary events that must be carefully analyzed for comparability," but the parties did not include "any trade-area analysis for any of the proffered comparable sales." This failure left the tax court "with no objective

24

basis for evaluating the true comparability of the subject property to the proffered comparables with respect to a critical factor . . . the quality of [the] retail location." Based on its reservations, the tax court concluded that "the sales comparison approach . . . was not entitled to controlling weight." The tax court found in its amended order that this "judgment was well within [its] discretion."

We agree. "[T]he weight placed on each approach depends on the facts of each case," *Cont'l Retail LLC v. Cty. of Hennepin*, 801 N.W.2d 395, 402 (Minn. 2011), and the calculation of a property's valuation is best approached by using at least two of the three valuation methods, *see Am. Express Fin. Advisors*, 573 N.W.2d at 657; *Equitable Life Assurance Soc'y*, 530 N.W.2d at 553-54. We have also stated that property valuation is an inexact science and that it is for the tax court to determine the weight that it will assign to each approach. *See Cont'l Retail*, 801 N.W.2d at 399; *Harold Chevrolet*, 526 N.W.2d at 59; *Lewis & Harris*, 516 N.W.2d at 180. In arguing for a theory of valuation that limits the assessed value to the price paid in the last comparable sales transaction, Menard ignores these well-established principles. Not surprisingly, none of our decisions support this narrow view of the inexact science of real property appraisal.

In sum, the tax court properly exercised its broad discretion in weighting the sales comparison approach and the cost approach for the four valuation years at issue. Moreover, the tax court adequately explained its reasoning for that decision.

Affirmed.


STRAS, J., took no part in the consideration or decision of this case.

25